**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1321
_____

UNITED STATES OF AMERICA

v.

MICHAEL TYRONE WALLER,
Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Crim. No. 08-cr-00423-001)
District Judge:  Hon. Alan N. Bloch

Argued January 25, 2011
_____

Before: FUENTES and CHAGARES, <u>Circuit Judges</u>, and
POLLAK,[*] <u>District Judge</u>.

(Filed: August 16, 2011)

---

[*]The Honorable Louis H. Pollak, Senior United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

Lisa B. Freeland, Esq.
Renee Pietropaolo, Esq. (Argued)
Office of the Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
          Attorneys for Appellant

Robert L. Eberhardt, Esq.
Rebecca R. Haywood, Esq. (Argued)
Ross E. Lenhardt, Esq.
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
          Attorneys for Appellee

_____

OPINION

_____


CHAGARES, Circuit Judge.

A jury impaneled in the Western District of Pennsylvania convicted Michael Tyrone Waller of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), possessing heroin with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  On appeal, Waller

contends that the District Court committed reversible error in administering its instructions to the jury. We agree and will, therefore, vacate the judgment of conviction and remand the case to the District Court for a new trial.

I.

At 3:30 in the morning on March 31, 2008, Officers Saldutte and Matson, on patrol in their police cruiser, pulled behind a Cadillac that was stopped at a red light in a high crime area of Pittsburgh, Pennsylvania. The officers observed that the Cadillac had a burned out brake light and multiple obstructions hanging from its rear view mirror, both of which are "purported violations of the Motor Vehicle Code." Appendix ("App.") 149. Accordingly, the officers activated emergency lights and sirens, and the Cadillac immediately pulled over. From his seat in the police cruiser, Officer Saldutte saw Waller, the Cadillac's passenger, turn around and look over his left shoulder in the officers' direction. When Waller turned back to face the windshield, he leaned over to his left as if he was "reaching down into his waistband or the middle of the seat." App. 153. Officer Saldutte believed he was retrieving or concealing a firearm. The driver of the vehicle, DeAngelo Hays, was also moving around inside the car.

Officer Saldutte approached the driver's side of the Cadillac while Officer Matson remained in the cruiser. Officer Ewing, who observed the stop from his own patrol car and came to assist, approached the passenger's side. Hays appeared nervous as Officer Saldutte explained the reason for the stop to him, so Saldutte asked him to step out of the car to

3

undergo a pat-down. Saldutte found no weapons, however, and promptly instructed Hays to reenter the car.

In the meantime, Officer Ewing had detected a bulge under Waller's clothing at his right hip. He therefore asked Waller to step out of the car so that he could conduct a pat-down. Upon feeling a weapon under Waller's waistband, Officer Ewing yelled "gun" to get the attention of his fellow officers. This excited Waller, causing him to "push off the vehicle" and "tustle" with Officer Ewing. App. 176. In an attempt to subdue the now excited Waller, Officer Ewing wrapped his arms around Waller's waist. Officer Saldutte came over to assist, grabbing Waller's right arm to prevent him from reaching for the gun. Officer Ewing then did a leg sweep, causing all three men to fall to the ground. While on the ground, Officer Saldutte yelled to Officer Ewing that he believed Waller to be attempting to reach for the gun in his waistband. Perceiving this as a threat, Officer Ewing "delivered two elbow strikes to [Waller's] face," and Officer Saldutte "delivered a series of punches to the right side of Waller's face." App. 160-61, 177. At that point, Waller capitulated stating, "okay, I'm done." App. 161. He submitted to arrest without further incident.

In the course of conducting a search incident to arrest, Officer Ewing found a .38 caliber revolver, loaded with six rounds of ammunition, in the waistband of Waller's pants. From Waller's jacket pocket, Officer Ewing recovered a plastic baggie containing fifty-two individual stamp bags of heroin marked "Shoot, Shoot Them," App. 162, 171, which were bundled into four groups of ten and one group of twelve. The police did not find any other indicia of drug use, such as needles, syringes, bottle caps, spoons, lighters, or track

4

marks, on Waller. Neither did they find any other indicia of drug distribution, such as United States currency, a cell phone, or owe sheets — lists typically used by drug dealers to keep record of which customers owe them money at any given time.[1] At the time of Waller's arrest, Officer Saldutte believed Waller's eyes and skin color looked normal. And neither Officer Ewing nor Officer Matson believed Waller to have been under the influence of drugs. Officer Ewing, however, did describe Waller's actions as "[m]ore slow. Attitude was like slow speech." App. 180. The officers did not observe Waller selling heroin, and the Government never offered evidence that he had done so at any time. The total weight of the heroin seized from Waller was 1.63 grams. To conceptualize the amount, defense counsel noted that a packet of Equal sugar weighs one gram.

The Government charged Waller with possession of a firearm by a convicted felon, possession with intent to distribute heroin, and possession of a firearm in furtherance of a drug trafficking crime. At trial, Waller admitted guilt as to the first count, and he admitted that he possessed the heroin in question. As such, the only contested issue was whether Waller possessed the heroin (and, therefore, the gun) in furtherance of a drug trafficking crime.

To prove that Waller had the requisite intent to deliver the heroin the Government relied on the expert testimony of Pennsylvania State Police Trooper Michael Warfield. Trooper Warfield explained that heroin is typically packaged

---

[1] Similarly, there was no evidence that the police ever searched Waller's residence to determine whether he kept paraphernalia typical of drug dealers there.

5

and sold in glassine baggies, called stamp bags. Heroin can be snorted or it can be heated into a liquid, placed into a syringe and injected into a vein. Although Trooper Warfield was not sure how snorting heroin feels in comparison to injecting it, he opined that "it's not as strong of an effect." App. 215. And he believed that addicts progress from snorting to shooting heroin. He further testified that heroin users gradually need increasing amounts of heroin to achieve the same high. Finally, he noted that an addict who goes without heroin for any length of time becomes physically sick, whereas addicts who have recently taken the drug generally possess a calm demeanor.

Trooper Warfield estimated that each stamp bag in Waller's possession would sell for between $10.00 and $20.00, making the total value of the heroin found on his person approximately $500.00 to $1,000.00. Trooper Warfield stated that he had "never met no one who was addicted to heroin to have fifty-two bags" on him at one time. App. 243-44. Nevertheless, he acknowledged that addicts can use anywhere from five to ten bags a day. Thus, a weeks' worth of heroin for one addict could be between thirty-five and seventy stamp bags, and there were two people in the car. Trooper Warfield further stated that heroin addicts do not commonly possess firearms. But he later qualified this testimony, explaining that addicts often have firearms in order to trade them for drugs. In contrast, he stated, drug dealers frequently carry loaded firearms for protection. Lastly, Trooper Warfield opined that a dealer would not typically carry his cutting agents and owe sheets with him when out on the streets.

After hearing this evidence, the jury returned a guilty verdict on each of the three counts. This appeal of the conviction timely followed.

## II.

The District Court had jurisdiction over this action pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction over the District Court's final judgment of conviction pursuant to 28 U.S.C. § 1291.

On appeal, Waller asserts that the District Court committed reversible constitutional error in administering its jury instruction on the issue of intent. Where, as here, a party has timely objected at trial to a jury instruction given by the district court, our review of the legal standard expressed in the instruction is plenary. United States v. Jimenez, 513 F.3d 62, 74 (3d Cir. 2008). Should we deem the instruction given to be legally proper, we review the district court's refusal to give any other particular instruction only for an abuse of discretion. Id. In so conducting our review, "we consider the totality of the instructions and not a particular sentence or paragraph in isolation." Id. at 74-75 (quotation marks omitted).

We subject any constitutional defect in the jury instructions to a harmless error analysis. By this standard, a constitutional error requires reversal unless it can be "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). As we have previously made clear, "the relevant question under Chapman is not whether, in a trial that occurred without the error, a

7

guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Gov't of the V.I. v. Martinez, 620 F.3d 321, 337 (3d Cir. 2010) (quotation marks omitted).

III.

A.

The Government contended at trial that Waller was a low-level drug dealer who possessed the 1.63 grams of heroin found on his person for the purpose of selling it to others. The defense maintained, however, that Waller was merely a drug addict, who intended to make personal use of the 1.63 grams of heroin that he admittedly possessed. The defense thus proceeded on the theory that Waller was not guilty of possessing the heroin with the intent to deliver; rather, he was guilty only of the lesser-included offense of simple possession. And if the jury agreed that he was guilty only of simple possession, it must further conclude that he had not possessed the gun in furtherance of a drug trafficking crime. Having no direct evidence bearing on the only contested issue at trial — Waller's intent — both parties relied entirely on circumstantial evidence to support their theories of the case.

At the conclusion of the evidence, the District Court provided the jury with the following instruction on intent, with which Waller takes issue:

> Intent ordinarily may not be proved directly because there is not a way of fathoming or scrutinizing the operation of the human mind. However,

8

you may infer a defendant's intent from all of the surrounding circumstances. For example, in determining whether a defendant has had the intent to distribute controlled substances, you may consider, among other things, the quantity of the controlled substances involved and the amount of cash involved. <u>You may also consider any statements made or omitted by the defendant</u>, as well as all other facts and circumstances in evidence which demonstrate the defendant's state of mind.

App. 267 (emphasis added). Waller contends that, in permitting the jury to consider any "statements made <u>or</u> <u>omitted</u> by the defendant," the District Court improperly invited the jury to infer intent from Waller's post-arrest, post–<u>Miranda</u>[2] warnings silence, in violation of his right to due process under the Fifth Amendment and the rule announced in <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976).[3] For the reasons set forth below, we agree.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436, 467-73 (1966).

[3] The Government interprets Waller's argument to encompass both his right to post-arrest, post-<u>Miranda</u> silence and his right to silence at trial. This is not so. Waller concedes that the District Court's instructions, when viewed in their entirety, made clear to the jury that Waller had an absolute right not to testify or offer any evidence at trial. Waller argues only that the District Court's instructions improperly

Before we turn to the merits of Waller's constitutional claim, however, we address the favorable comparisons that have been drawn between the instruction given by the District Court and two different model instructions on intent. The Government suggests that these comparisons are of use in evaluating the propriety of the District Court's instruction in this case. We disagree.

First, we turn to the District Court's comparison of its own instruction to this Court's Pattern Instruction on intent. Waller timely objected to the challenged instruction at trial and, in so doing, proposed a curative instruction to clarify that, in referring to "statements made or omitted," the District Court intended to refer only to statements and omissions from statements that the defendant made before his arrest.[4] The

permitted the jury to consider his failure to make a statement prior to trial. See Waller Br. 13, 16, 20.

[4] Specifically, Waller suggested that the District Court clarify that, by the phrase "statements made or omitted," the court

> refers only to statements and omissions from statements which a defendant makes before his arrest. As you deliberate, you may not consider as evidence of guilt on Count Two the fact that the defendant did not make a statement following the March 31, 2008 arrest. Just as the defendant has a right to remain silent and not testify at trial, the defendant has a right to remain silent out of Court. And the fact that the

10

District Court, however, declined to alter its instruction, reasoning that the instruction given was "very similar to the Third Circuit model charge" on intent.  App. 278.

The District Court is indeed correct in its assertion that the Third Circuit's Pattern Instruction on intent is only minimally different from the challenged instruction in this case.    But that minimal difference is of great legal significance.  The Pattern Instruction conspicuously refrains from employing the very language that Waller argued was objectionable in the District Court's instruction.  Specifically, our Pattern Instruction provides:

> [T]o determine [the defendant's] state of mind (what [the defendant] intended or knew) at a particular time, you may consider evidence about what [the defendant] said, what [the defendant] did and failed to do, how [the defendant] acted, and all other facts and circumstances shown by the evidence that may prove what was in [the defendant's] mind at that time.

Third Circuit Model Criminal Jury Instructions, ch. 5.01 (emphasis omitted).  Thus, the Pattern Instruction permits the

---

> defendant did not make a statement, either in or out of Court, may not be considered by you or even discussed in your deliberations.

App. 277-78.

11

jury to take into account only those statements <u>actually made</u> by the defendant, as well as the defendant's failures to <u>act</u>, both of which are decidedly proper for the jury to consider in determining whether a defendant possessed the necessary intent to commit the crime charged. <u>See</u>, <u>e.g.</u>, <u>United States v. Mendez-Zamora</u>, 296 F.3d 1013, 1018 (10th Cir. 2002) ("To suggest that a person's state of mind can be inferred from his omissions (as well as his acts) is merely to utter common sense. We fail to see how the instruction reduces the government's burden to prove all elements of the offense beyond a reasonable doubt or how it in any way compels a defendant to incriminate himself."). The Pattern Instruction does <u>not</u> invite the jury to consider statements omitted by the defendant, or otherwise comment on the defendant's failure to speak. Accordingly, any similarities that may exist between the District Court's instruction and this Court's Pattern Instruction are immaterial to whether the challenged portion of the instruction employed in this case raises constitutional concerns.

Second, the Government asserts that the District Court's instruction cannot be improper because, in <u>United States v. Garrett</u>, 574 F.2d 778, 783 (3d Cir. 1978), we approved the language of the model instruction contained in 1 Devitt & Blackmar, Federal Jury Practice and Instructions: Criminal, § 14.13 (1977), on which the District Court's instruction was based. Gov't Br. 16. This argument, too, is unavailing.

In <u>Garrett</u>, we considered the question of whether an instruction on intent, which created a presumption that a defendant intended the natural and probable consequences of his actions, impermissibly shifted the burden to the defendant

12

to prove that he was not guilty.  See Garrett, 574 F.3d at 782. And in so considering the challenged portion of that instruction, we suggested only that the language from Devitt & Blackmar § 14.13 "may be of some help to trial judges in avoiding the use of instructions on intent that might be construed by a jury to shift the burden of proof to the defendant in a criminal case."  Id. at 783.  We were not asked, and thus we did not address, whether the Devitt & Blackmar instruction would be of the same help to trial judges in preserving an accused's right to silence.  Thus, our decision in Garrett contributes little of value to the present analysis.

With these issues settled, we turn to the merits of Waller's constitutional claim.

### B.

The Fifth Amendment provides that "no person…shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In order to give full effect to this privilege against self-incrimination, the Supreme Court has made clear that the Fifth Amendment permits neither comment by the prosecution on the accused's silence at trial nor instructions by the court that such silence is evidence of guilt.  Griffin v. California, 380 U.S. 609, 614-15 (1965); see also United States v. Isaac, 134 F.3d 199, 206 (3d Cir. 1998). The Fifth Amendment necessarily so forbids because any other rule would impermissibly penalize the exercise of the constitutional privilege; it would "cut[] down on the privilege by making its assertion costly."  Griffin, 380 U.S. at 614.

As a means of safeguarding the privilege against self-incrimination prior to trial, the Supreme Court announced, in

13

Miranda v. Arizona, the now ubiquitous rule that an accused must be warned, upon being taken into custody, "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The Supreme Court subsequently made clear in Doyle v. Ohio, 426 U.S. 610, 619 (1976), that once these prophylactic Miranda warnings have been given, the Due Process Clause forbids the "prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence." Hassine v. Zimmerman, 160 F.3d 941, 947 (3d Cir. 1998). This must be so because "Miranda warnings carry the Government's 'implicit assurance' that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him." Martinez, 620 F.3d at 335. And "[b]ecause a defendant's post-Miranda warning[s] silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing" his failure to give an exculpatory account to the police after receiving the warnings to be invoked later as inculpatory evidence against him. Id.

The Supreme Court's holding in Doyle that the prosecutor may not cause the jury to draw an impermissible inference of guilt based on the defendant's post–Miranda warnings silence necessarily implies that the trial court is so forbidden as well. Cf. Griffin, 380 U.S. at 613 (holding that neither the prosecutor nor the trial court may adversely comment on a defendant's silence at trial). And indeed, the Government readily concedes that, in light of the Supreme Court's admonishment in Doyle that "[s]ilence in the wake of [Miranda] warnings may be nothing more than the arrestee's

14

exercise of these <u>Miranda</u> rights," 426 U.S. at 617, "a jury cannot, as a matter of due process, consider a defendant's silence post-<u>Miranda</u> warnings[.]" Gov't Br. 24. Nonetheless, the Government argues that the District Court's instruction permitting the jury to consider "statements made or omitted by the defendant" did not violate the rule of <u>Doyle</u> because it only allowed the jury to take account of Waller's <u>pre</u>-arrest silence.[5] The challenged phrase, the argument goes, permitted the jury to consider only omissions from statements that were in evidence. And because the evidence presented at trial ended at the moment that Waller was arrested, the instruction could not possibly have implicated Waller's failure to make a post–<u>Miranda</u> warnings statement. We disagree.

To begin, we cannot accept the Government's assertion that the jury clearly would have understood the District Court's instruction to refer only to omissions from statements for which there was evidence presented at trial. The relevant portion of the instruction told the jury that it "may also consider any statements made or omitted by the

---

[5] We note that this argument relies substantially on an assumption that the use of Waller's <u>pre</u>-arrest silence as substantive evidence of guilt would give rise to no constitutional concerns. It is not entirely clear that this is so. <u>See</u> <u>Combs v. Coyle</u>, 205 F.3d 269, 282 (6th Cir. 2000) (collecting cases). Nonetheless, we need not resolve this issue because the District Court's instruction is reasonably construed as a comment on the defendant's post–<u>Miranda</u> warnings silence, and the Government readily concedes that any such comment by the court is constitutionally infirm.

defendant, as well as all other facts and circumstances in evidence which demonstrate the defendant's state of mind." The Government contends that the phrase "in evidence" modifies the first clause of the sentence, as well as the second clause. But the defendant did not believe the instruction to be entirely lucid in that regard, as evidenced by his request for a curative instruction, and neither do we. We think it at least equally reasonable to interpret the two clauses of the sentence to be independently operative, first inviting the jury to consider — without any temporal limitation — all statements that the defendant made or failed to make, then inviting the jury to consider any other relevant facts of which it was presented with evidence at trial.

Moreover, the fact that there was no evidence of a post-Miranda statement presented at trial is precisely why the instruction, which allowed the jury to consider statements that Waller did <u>not</u> make, is problematic. The Government suggests that the absence of evidence demonstrating that Waller failed to make a post-Miranda statement somehow operated to prevent the jurors from pondering why they were not presented with evidence affirmatively demonstrating that Waller <u>did</u> give a post-Miranda statement. But, in fact, the absence of such evidence is likely have had quite the opposite effect when combined with an instruction from the District Court that expressly encouraged the jurors to speculate as to statements that the defendant could have made, but did not.[6]

---

[6] Additionally, as Waller aptly points out, it would have in fact been <u>error</u> for the Government to offer into evidence any testimony that Waller refused to make a statement after he received <u>Miranda</u> warnings. <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 628 (1993); <u>Doyle</u>, 426 U.S. at 617. Thus, we

16

And though "the inference of guilt for failure to [make a statement] as to facts peculiarly within the accused's knowledge [may be] natural and irresistible" to a jury, "[w]hat the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." Griffin, 380 U.S. at 614.

In short, the District Court's instruction permitted the jury to infer that Waller had the requisite intent to deliver the heroin from the fact that he exercised his right to remain silent after receiving his Miranda warnings. This is precisely what the Fifth Amendment, as explicated in Doyle, forbids.

C.

Notwithstanding the foregoing, we recognize that "[n]ot all errors mandate reversal. When the error found is of a constitutional nature, a court may nonetheless uphold the conviction if the error was 'harmless beyond a reasonable doubt.'" United States v. Korey, 472 F.3d 89, 96 (3d Cir. 2007) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279 (1993)).

Though the harmless error analysis leaves room for certain convictions to stand, regardless of the presence of constitutional error at trial, it places a decidedly heavy burden on the Government to demonstrate that reversal is not warranted. Having sustained a violation of his Fifth

_____

cannot fathom how the absence of such evidence in the record could bear on the propriety of the instruction given.

Amendment rights, Waller is entitled to a new trial <u>unless</u> the Government can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." <u>Chapman</u>, 386 U.S. at 24. In the particular context presented here, we have said that "[a] verdict may still stand, despite erroneous jury instructions [on the issue of intent], where the predicate facts conclusively establish intent, so that no rational jury could find that the defendant did not intend [the criminal act charged]." <u>Korey</u>, 472 F.3d at 96-97 (quotation marks omitted).

The evidence of intent presented at trial can be summarized as follows. The prosecution posited that Waller's possession of fifty-two stamp bags of heroin and a loaded revolver indicated possession for sale, not for personal use. The Government also relied on the expert testimony of Trooper Warfield. Trooper Warfield estimated each stamp bag would sell for between $10.00 and $20.00. He stated that he had "never met no one who was addicted to heroin to have fifty-two bags," and he opined that in his experience a user of heroin does not commonly possess a firearm, but that a drug dealer would carry a firearm to protect himself, his drugs and his money. During the search incident to the arrest, the police did not find any paraphernalia for injecting heroin intravenously. Nor did they locate any track marks on Waller's body. Based on this circumstantial evidence, the Government argued that Waller must have possessed the drugs for the purpose of dealing them.

The defense similarly relied on circumstantial evidence to demonstrate that Waller intended the heroin for personal use and not for sale. The police stopped Waller at the end of the night and he had no U.S. currency in his

18

possession. The defense suggested that the absence of cash undermined the Government's theory that he had been selling heroin and bolstered the theory that he had just spent all of his cash buying the heroin that he now possessed. Although Trooper Warfield had never encountered a heroin addict with fifty-two stamp bags in his possession, he also explained to the jury that an addict could use five to ten bags a day. Thus, fifty-two bags is essentially one week's worth of heroin for an addict, and there were two people in the car. Trooper Warfield also noted that good customers might be given extra stamp bags in a bundle. One of the five bundles in Waller's possession had two extra stamp bags. And although Trooper Warfield stated that drug users do not commonly possess firearms, he later qualified this testimony, explaining that drug users often possess firearms in order to trade them for drugs. Finally, the defense challenged the significance of the fact that Waller had no paraphernalia for injecting heroin and exhibited no track marks from heroin injections. The defense noted that a heroin snorter would not need such paraphernalia and neither would a snorter have track marks. Instead, the defense pointed to the absence of evidence of packaging and dealing paraphernalia as substantially undermining the Government's theory that Waller was a dealer.

This body of wholly circumstantial evidence, viewed in its entirety, is simply not the kind of overwhelming evidence of guilt that would readily lead us to find that the "guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan, 508 U.S. at 279 (emphasis omitted). It is rather easy to see how the erroneous instruction might, in fact, have contributed to the jury's verdict: in the face of equivocal evidence of Waller's intent, the jurors were invited by the District Court to consider the

19

statements that he failed to make. And a juror could have plausibly decided that, if Waller merely intended to use the heroin rather than sell it, he would have said as much to the police prior to trial, since he was ready and willing to admit to this simple possession during trial. To such a juror, the fact that Waller failed to explain his possession of the heroin after he was arrested would be substantive evidence of his guilt. In light of the District Court's instruction on intent, this juror could reasonably have believed that such an omission on Waller's part was exactly the type of substantive evidence he or she was meant to consider.

Under such circumstances, we cannot conclude that the District Court's erroneous instruction was harmless beyond a reasonable doubt. Waller is, therefore, entitled to a new trial.[7]

## IV.

For the foregoing reasons, we will vacate the judgment of conviction and remand for a new trial.

---

[7] Waller additionally claims that he is entitled to a new trial because of prosecutorial misconduct. Specifically, he argues that statements related to sentencing and juror anonymity, which the prosecutor made during closing arguments, significantly burdened his rights under the Fifth and Sixth Amendments so as to render his trial unfair. We need not pass on the import of these statements because we conclude that Waller is entitled to a new trial on other grounds.