Filed 4/23/15  P. v. Tom CA1/3
Opinion following remand from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICHARD TOM,<br><br>        Defendant and Appellant. | A124765<br><br>(San Mateo County<br>  Super. Ct. No. SC064912) |
| In re RICHARD TOM,<br><br>        on Habeas Corpus. | A130151<br><br>(San Mateo County<br>  Super. Ct. No. SC064912) |

On the evening of February 19, 2007, defendant Richard Tom, while driving at a high rate of speed, broadsided a vehicle driven by Loraine Wong as she was making a left turn from Santa Clara Avenue onto Woodside Road in Redwood City.  Wong's two daughters, Kendall (aged 10) and Sydney (8) were riding in the rear passenger seat.  Sydney died as a result of injuries sustained in the collision.  Kendall survived, but sustained serious injuries.  As a result of the collision, defendant was charged with gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)), driving under the influence causing harm to another (Veh. Code, § 23153, subd. (a)), and driving with a blood alcohol level of 0.08 percent or higher causing harm to another (Veh. Code, § 23153, subd. (b)).  Defendant pleaded not guilty to all charges.  After a lengthy trial, the

1

jury acquitted defendant of all alcohol-related charges but returned a guilty verdict on gross vehicular manslaughter as a lesser included offense of gross vehicular manslaughter while intoxicated. The trial court sentenced defendant to an aggregate term of seven years, consisting of the middle term of four years on his conviction for gross vehicular manslaughter, plus a term of three years for the personal infliction of great bodily injury on Kendall as a sentence enhancement (Pen. Code, § 12022.7). In addition, the court ordered defendant to pay restitution in the sum of $147,860.82.

In case No. A124765, defendant appeals the judgment imposed following his jury-trial conviction. He asserts multiple grounds for reversal, including deprivation of constitutional rights, prosecutorial misconduct, improper admission of opinion testimony, prosecutorial failure to disclose exculpatory evidence, ineffective assistance of counsel, and sentencing error. In case No. A130151, defendant petitions for a writ of habeas corpus on the grounds of ineffective assistance of counsel and prosecutorial misconduct.

In our earlier opinion, we concluded that the prosecution had violated defendant's Fifth Amendment privilege against self-incrimination by proffering testimony of his post-arrest, pre-*Miranda* silence as consciousness of guilt evidence. (*People v. Tom* (Mar. 19, 2012, A124765, A130151 (consol.) [nonpub. opn.] at p. 2 (*Tom I*).) Because we concluded the error was not harmless, we reversed the judgment and remanded the matter for further proceedings consistent with our opinion and we dismissed the writ petition as moot. (*Ibid.*) Our Supreme Court granted review, and, in a 4-3 decision, reversed our decision and held that, as a matter of first impression, defendant was required to unambiguously invoke his Fifth Amendment right against self-incrimination in order to rely on that privilege to preclude the admission of his post-arrest, pre-*Miranda* silence as consciousness of guilt evidence. (*People v. Tom* (2014) 59 Cal.4th 1210, 1214 (*Tom II*).) Because we had not considered, as a question of fact, whether defendant had unambiguously invoked his Fifth Amendment privilege, the Supreme Court remanded the matter with directions that we consider the issue in the first instance and, if necessary, the other issues raised on direct appeal. (*Id*. at pp. 1215, 1237.)

2

Having considered the contentions raised on appeal, we now conclude that the prosecution's proffer of evidence of defendant's post-arrest, pre-*Miranda* and post-*Miranda* silence after he unambiguously invoked his right to remain silent violated both his federal constitutional Fifth Amendment right against self-incrimination and his Fourteenth Amendment due process right to a fair trial. We further conclude that the erroneous admission of evidence was not harmless beyond a reasonable doubt. Accordingly, on the appeal in case No. A124765, we reverse the judgment and remand the matter for further proceedings consistent with this opinion. In case No. A130151, we dismiss the petition for a writ of habeas corpus as moot.

## FACTUAL BACKGROUND

At trial the prosecution presented testimony by several police officers who described the scene at the collision, as well as the events following the collision which culminated in defendant's arrest. Other prosecution witnesses included Loraine Wong and Peter Gamino, a retired police officer and friend of defendant. Gamino was with defendant during the evening the accident occurred and was driving another vehicle behind defendant's vehicle when the collision occurred. There were no third-party witnesses to the collision and both sides presented expert testimony regarding the speed of defendant's vehicle at the time of the collision. We recount pertinent trial testimony below.[1]

**The Accident**

On the evening of February 19, 2007, Loraine Wong decided to take her daughters, Sidney and Kendall (ages eight and ten), to her sister's house in Sunnyvale for an overnight visit. Wong drove a Nissan Maxima automatic sedan that evening. Kendall was seated in the rear passenger side of the Nissan and Sidney sat in a booster seat next to

---

[1] The parties presented expert testimony regarding whether defendant's blood alcohol level, measured several hours after the accident, indicated that he was impaired at the time of the accident. We do not recount any of that expert testimony on blood alcohol level because defendant was acquitted on the alcohol related offenses.

Kendall. Before departing, Wong secured both girls in their seat belts and fastened her own seat belt.

Wong took Santa Clara Avenue to Woodside Road enroute to her sister's home. Upon reaching the intersection of Woodside Road and Santa Clara Avenue, Wong planned to turn left and proceed on Woodside Road to the Southbound I-280 on ramp. Wong drove this route to her sister's home hundreds of times during the 15 years she lived on Santa Clara Avenue. As Wong backed out of the driveway, she called her sister on a hand-held cell phone to let her know "we were on our way to her house." The evening was chilly and clear. Wong spoke with her sister for a few minutes until she came to a full stop at the intersection of Santa Clara Avenue and Woodside Road. Wong had finished her conversation with her sister but still had the cell phone in her hand. Her car's headlights and left-turn indicator were on.

Wong entered the intersection by inching forward, and looking to her left, she observed the next cross-street, Alameda de las Pulgas. Wong then looked right and left again. Seeing no on-coming vehicles in either direction, she eased onto the accelerator pedal to execute a left turn. As she began to turn she "saw a big flash of light" and was struck by a vehicle on her left (driver's) side. Before she saw the flash of light, Wong heard no sound associated with a car braking or a horn. She did not see headlights to her left and never saw defendant's car. Wong estimated she was going about 15 miles per hour at the time of the collision.

After the collision, Wong discovered that her daughters were injured. She yelled their names: Kendall responded, but Sidney did not and never regained consciousness. Shortly, medical personnel arrived at the scene and extracted Wong and her daughters from the vehicle. Wong, Sidney, and Kendall were transported to the hospital. There, Wong was informed that Sidney had died.[2] Kendall sustained a cut to her forehead that

---

[2] Dr. Tom Rogers, a forensic pathologist, performed the autopsy on Sidney. Rogers testified that the cause of death was multiple external and internal injuries caused by blunt force trauma. The injuries were consistent with a child restrained in a booster seat in a vehicle that was T-boned by a speeding car.

4

required 30-40 stitches, a broken arm and an injury to her neck, and Wong suffered a broken rib and finger. Wong was released from the hospital on the night of the collision but Kendall remained in the hospital for a week.

Retired San Francisco Police Officer Peter Gamino testified that he had known defendant for about 20 years. On the evening of the accident, Gamino was visiting California and staying at defendant's house near Woodside Road. At around 6:00 p.m. Gamino and defendant had a couple of cocktails before dinner. About an hour later, they ate dinner and finished in half an hour. After dinner, they drove in defendant's Mercedes to defendant's son's house in order to pick up a Toyota Camry. After retrieving the Toyota, they left. Defendant drove his Mercedes and Gamino drove the Toyota. Gamino followed defendant onto Woodside Road. Gamino was driving at about 40 miles per hour and about 200 yards behind defendant when he observed "dust and dirt[] all over the place," indicating that a collision had occurred. He made a U-turn and circled back to the collision scene to check on defendant. Defendant was groaning in pain, and said, "I didn't even see it."

**Post-Accident Investigation**

Sergeant Alan Bailey and Officer Josh Price of the Redwood City Police Department were among the first law enforcement officers to arrive at the scene of the collision and testified at trial. Sergeant Bailey arrived at about 8:30 p.m. and took charge of coordinating the investigation. He observed that conditions were dry and it was a "pleasant evening." Santa Clara Avenue is a two-lane roadway, running east and west, which intersects Woodside Road, a four-lane roadway running north and south. Defendant's Mercedes was a considerable distance north of the Woodside Road/Santa Clara Avenue intersection. The Mercedes had sustained major front-end damage, the windshield was cracked, and a couple of tires were flat. The other vehicle involved in the collision, a Nissan Maxima, had also sustained "major, total damage." There was massive intrusion to the Nissan's left rear passenger door, the entire rear end of the vehicle was "destroyed," and the front windshield, the back window, and the left rear

5

passenger window were all shattered.  The occupants of the Nissan had been removed from the vehicle by paramedics by the time Bailey arrived.

Sergeant Bailey surveyed the scene and tried to figure out how the collision occurred.  Based on the damage to the vehicles, their likely direction of travel and points of rest in relation to the point of impact, and the very large "debris field," Sergeant Bailey concluded that (1) the Mercedes broadsided the Nissan while the Mercedes was traveling north on Woodside Road and the Nissan was attempting to make a left hand turn onto Woodside Road from Santa Clara Avenue; and (2) defendant was going "extremely fast," and was "not even close" to the posted speed limit of 35 miles per hour when his Mercedes collided with the Nissan.

**Accident Reconstruction Investigation and Expert Testimony At Trial**

Redwood City Police Motor Officer Janine O'Gorman, the lead traffic investigator for the accident, testified in the prosecution's case-in-chief.  She arrived at the scene at 9:30 p.m.  She first walked around the perimeter of the large debris field and made a visual inspection of the vehicles involved in the collision in order to establish a reference point and map out the scene.  She also observed a gouge mark on the roadway and yaw[3] and tire friction marks.  Yaw marks began at the point of impact and led straight to defendant's Mercedes.  Based on the gouge mark and the point at which the yaw and tire friction marks began, O'Gorman determined the point of impact was at the intersection of Woodside Road and Santa Clara Avenue.  O'Gorman determined that the distance from the point of impact to the Mercedes was 239.9 feet, and that the Nissan came to rest about 60 feet from the point of impact.  There was no evidence of pre-braking tire friction marks consistent with the Mercedes' anti-lock braking system, indicating that defendant did not apply the brakes before the collision.

On cross-examination, O'Gorman testified that under California's basic speed law a driver must drive at a speed that is safe under the conditions.  She regularly patrolled

---

[3]     O'Gorman explained that a yaw mark is one made by a tire when the tire is not turning in the direction in which the vehicle is moving.

the stretch of Woodside Road where the collision occurred. On that stretch, drivers usually exceeded the posted speed limit of 35 miles per hour at night when traffic was extremely light. Using a radar gun, O'Gorman clocked the average night time driving speed at 40 miles per hour. Police deemed that speeds of 50 miles per hour and above were unsafe on that stretch of Woodside Road.

Officer Jincy Pace, a traffic accident investigator with the San Jose Police Department, testified for the prosecution as an expert in the area of collision reconstruction. Based on her review of photos of the collision scene, O'Gorman's diagram mapping the scene, and forensic mapping of the crush-depth on the vehicles, Officer Pace concluded that the operation of defendant's Mercedes at a speed unsafe for conditions was the primary factor in the collision.

To determine the speed of the Mercedes at the point of impact, Officer Pace used a method known as conservation of linear momentum. Using this methodology, Officer Pace first calculated the post-impact speed of the Mercedes and then applied what she considered a "ludicrous[ly]" low drag factor of 0.3 (the equivalent of slamming brakes on in snow), to account for the fact that the Mercedes was spinning post-impact.[4] Officer Pace opined that defendant's post-impact speed was 47 miles per hour using "a low drag factor." If she applied a drag factor of 0.65, more typical for dry pavement, her estimate of defendant's post-impact speed would have been 69 miles per hour. Using the lower post-impact speed estimate of 47 miles per hour, Officer Pace opined that the speed of defendant's Mercedes at impact (pre-impact speed) was 67 miles per hour. She estimated that the Nissan's pre-impact speed was 12 miles per hour.

The defense relied on the testimony of Christopher Kauderer, an expert in accident reconstruction, to counter the opinions of Officer Pace. Kauderer testified that he was not permitted to do any destructive testing or examination of defendant's Mercedes, i.e., not allowed to take anything apart. As a consequence, Kauderer was unable to conduct a

---

[4]     A drag factor of 1.0 is the equivalent of driving through sand, a drag factor of 0.1 is the equivalent of driving on ice, and the "normal" drag factor used for an asphalt surface is 0.7-0.8.

mechanical inspection of the vehicle's three major systems, braking, throttle and steering, to see if there was any pre-existing mechanical condition and to document any effects of the collision on those systems.

To determine the speed of the Mercedes at the point of impact, Kauderer opted not to use the wholesale "drag factor" analysis employed by Officer Pace because assigning a drag factor to the Mercedes was, in his opinion, too speculative. The drag factor for the Mercedes was "unknown" because there were too many incalculable variables; in particular post-impact driver input, such as whether defendant had his "foot on the accelerator," steered or braked post-impact. Instead, Kauderer used the principle of conservation of momentum.[5] Employing this methodology, Kauderer opined that the Mercedes was traveling at 49 to 52 miles per hour and the Nissan was traveling at 7 to 9 miles per hour at impact. Based on his examination of the scene and the vehicles, human factors in play, as well as forensic mapping and his conservation of momentum analysis, Kauderer opined the primary collision factor was that the driver of the Nissan entered into the roadway and violated the right of way of the driver of the Mercedes, leaving the driver of the Mercedes insufficient reaction time to brake.

In rebuttal, the prosecution called San Jose Police Officer David Johnson as an expert in accident reconstruction because Officer Pace was unavailable to testify. Officer Johnson conducted a visual inspection of the Mercedes and observed that the vehicle's front left tire would prevent any post-impact steering by the driver and increase the Mercedes' drag factor. He also disagreed with Kauderer's assumption that the vehicles

---

[5]     The conservation of momentum principle operates on the assumption that the momentum of the vehicles going into the collision has to equal the momentum of the vehicles coming out of the collision. Using a drag factor range for the Nissan that was similar to the range used by the prosecution's expert, Kauderer applied that range to the Nissan's known distance of travel after impact (about 68 feet) to arrive at an estimate of the Nissan's post-impact speed of 27 to 29 miles per hour. Next, Kauderer assumed that both vehicles reached a common velocity during the collision and assigned a separation velocity (post-impact speed) of 27 to 29 miles per hour to the Mercedes also. Having determined that the post-impact speed of both vehicles, Kauderer examined the pre- and post-impact departure angles and the pre-impact approach angles, of both vehicles, to arrive at the speed at impact.

reached a common separation velocity and opined that a 29 miles-per-hour post-impact speed for the Mercedes was inconsistent with the distance the vehicle traveled after impact. Finally, Officer Johnson opined that the Mercedes' fuel pump would have shut off on impact.

## DISCUSSION

### I.    Consciousness of Guilt Evidence

Defendant contends that the testimony of Sergeant Bailey and Officer Price regarding defendant's failure to inquire about the welfare of the occupants of the Nissan was erroneously introduced as substantive evidence of guilt in violation of his Fifth Amendment privilege against self-incrimination, and his Fourteenth Amendment due process right to a fair trial, and that the error was not harmless beyond a reasonable doubt. We agree.

The record demonstrates that defendant was placed under arrest when the police transported him from the collision scene in a patrol car to the police station at 9:48 p.m. About 20 minutes after arriving at the police station and before reading defendant his *Miranda* rights, the police requested but defendant declined to give a tape-recorded statement. In lieu of a taped statement, the police arranged for two officers to witness defendant's statement. However, after speaking with his counsel by telephone, defendant told the officers that he would not give any statement in the absence of counsel. Officer Price then had defendant take a series of field sobriety tests (FSTs) modified to accommodate his injured ankle. Based on the results of the FSTs, Officer Price concluded defendant was under the influence of alcohol at the time of the collision. Officer Price handcuffed defendant, placed him under arrest for driving under the influence, and read him his *Miranda* rights. Defendant said he would not make a statement.

In support of his argument that the prosecutor erred in eliciting testimony in violation of his constitutional right to remain silent, defendant identifies several occasions during trial when police officers testified he did not inquire about the welfare of the occupants of the Nissan. To resolve this issue, we need recount only two questions posed

9

by the prosecutor and responses given by Officer Price and Sergeant Bailey. At the end of the prosecutor's direct examination of Officer Price, the prosecutor asked whether, during Price's contact with defendant from about 8:20 p.m. to approximately 11:30 p.m. on the evening in question, the defendant ever asked him "about the condition of the occupants of the Nissan."[6] Price answered, "No." At the end of the prosecutor's direct examination of Sergeant Bailey, the prosecutor also elicited a similar response from him when he was asked, "So, during any of this time [prior to defendant's arrest at the police station], did the defendant ever ask you about the occupants of the other vehicle?"[7] Bailey replied, "No, he did not."

We conclude, as do the parties, that during the post-arrest pre-*Miranda* time frame, defendant unambiguously invoked his right to remain silent when he told the police that he would not make any statement in the absence of counsel. After he was read his *Miranda* rights, defendant again unambiguously invoked his right to remain silent when he told the police he would not make a statement. Because the prosecutor's two questions were not sufficiently focused on the period exclusively *before* defendant unambiguously invoked his right to remain silent (post-arrest, pre-*Miranda* and post-*Miranda*), the admission of the testimony constitutes error in violation of defendant's federal constitutional Fifth Amendment right to remain silent (see *Salinas v. Texas* (2013) 570 U.S. __, ___ [186 L.Ed.2d 376, 133 S. Ct. 2174, 2178] (plur. opn. of Alito, J.); *Tom II, supra*, 59 Cal.4th at pp. 1225, 1235-1236) and his Fourteenth Amendment due process right to a fair trial (see *Doyle v. Ohio* (1976) 426 U.S. 610, 619 (*Doyle*); *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 (*Coffman and Marlow*)).[8]

---

[6]     The court overruled defense counsel's objection to the question on the ground of relevancy.

[7]     The court overruled defense counsel's objection to the question on the ground of relevancy after the prosecutor indicated she was seeking to elicit testimony showing defendant's "[c]onsciousness of guilt."

[8]     In light our determination, we do not need to address and we express no opinion on whether during the post-arrest pre-*Miranda* time frame defendant unambiguously

10

Nonetheless, the erroneous introduction of evidence of defendant's silence is trial error subject to the harmless error analysis standards of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 310.) The *Chapman* standard " 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).)

On this record, the People have not shown that the verdict rendered in this case was "surely unattributable to the error." (*Neal, supra*, 31 Cal.4th at p. 86.) "[D]efendant was not apprehended by the police in the course of committing the crime; neither were there 'numerous'—or indeed *any*— 'disinterested reliable eyewitnesses to the crime whose testimony [was] confirmed by a wealth of uncontroverted physical evidence.' " (*Id*. at p. 87.) Indeed, the evidence against defendant in this case was essentially in equipoise. For example, a key issue at trial was determining the pre-impact speed of defendant's vehicle. There was no dispute defendant was traveling faster than the posted speed limit of 35 miles per hour on Woodside Road. The question for the jury, however, was whether defendant acted with gross negligence in driving over the posted speed limit, to wit, whether his conduct displayed an "I don't care attitude"[9] and was so reckless that it created a high risk of death or great bodily injury. Both sides presented the testimony of accident reconstruction experts, and each adopted a different methodology in

---

invoked his right to remain silent prior to the time that he expressly told the police he would not make any statement in the absence of counsel.

[9]     The jury was instructed that "Gross negligence is the exercise of so slight a degree of care as to exhibit a conscious indifference or 'I don't care' attitude concerning the ultimate consequences of one's conduct."

calculating defendant's speed at impact. The prosecution's evidence established defendant's speed at impact was, at minimum, 67 miles per hour, and possibly much higher. However defendant's expert opined defendant's speed at impact was between 49 and 52 miles per hour, on a stretch of road where drivers routinely exceed the posted speed limit and police deem speeds of up to 50 miles per hour safe under certain conditions. Thus the resolution of defendant's guilt hinged on the jury's resolution of the conflicting expert testimony. Without corroboration by eyewitnesses and no physical evidence, mechanical or recorded, which conclusively determined defendant's speed at impact, the jury's assessment of defendant's conduct in the aftermath of the collision was very likely an important and even determinative factor in its verdict. And, thus, the prosecutor's entreaty to the jury to consider defendant's silence as evidence of his guilt took on added significance.

During closing argument, the prosecutor vigorously pressed the jury to find defendant's speed at impact was reliably determined by its expert. The prosecutor argued that defendant's speed, at the time of impact, demonstrated the "I don't care" attitude consistent with establishing gross negligence. After asserting that defendant "barrel[ed] down Woodside at double the speed limit," the prosecutor rhetorically stated, "Why did he not . . . at least slow down? . . . Because he was grossly negligent. He was driving down that night . . . without a care of what was going to happen. I don't care is the attitude that he had." The prosecutor explained to the jury that it could not consider defendant's failure to testify, but "should and can absolutely consider [ ] how he acted the night of the collision. And there's so much evidence about this. And all of it points to one thing; his consciousness of his own guilt." Pressing this theme, the prosecutor added: "The next one I think is particularly offensive, he never, ever asked, hey, how are the people in the other car doing? Not once. . . . Now you step on somebody's toe . . . what is your first thing out of your mouth? Whoops. I'm sorry. I'm not saying that he has to say sorry as an expression of his guilt or as some kind of confession, but simply as an expression of his regret. Look, I'm sorry those people were hurt. [¶] Not once. Do you know how many officers he had contact with that evening? Not a single one said that,

12

hey, the defendant asked me about how those people were doing. Why is that? Because he knew he had done a very, very, very bad thing, and he was scared. [¶] . . . And he was obsessed with only one thing, that is, saving his own skin." Given the circumstances—an emotionally charged case, involving the death of one child and serious injury to another, and hinging on competing theories of accident reconstruction yielding widely different estimates of defendant's speed at the point of impact—the prosecutor's argument urging the jury to consider defendant's failure to ask about the welfare of the occupants of the other car as substantive evidence of his guilt was highly prejudicial. We reject the Attorney General's assertion that the prosecutor's references to defendant's silence after he unambiguously invoked his right to remain silent were brief and inconsequential. The jurors were asked to draw a speculative inference of gross negligence based on defendant's failure to inquire about the welfare of the occupants of the other car. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 681-682 [evidence allowing only speculative inferences is irrelevant and inadmissible].) Indeed, the prosecutor went further by in essence asking "the jury to speculate about ─ and possibly base a verdict upon ─ 'evidence' never presented at trial" - defendant's silence in the presence of numerous officers that he had contact with that evening in addition to Sergeant Bailey and Officer Price. (*People v. Bolton* (1979) 23 Cal.3d 208, 212.)

We also see no merit to the Attorney General's additional arguments that the erroneous admission of evidence of defendant's silence was nonprejudicial error. The Attorney General asks us to consider that defendant failed to preserve the error for our review. However, defendant filed a pre-trial motion in limine to exclude statements obtained without a valid *Miranda* waiver and while he was under de facto arrest at the collision scene. This issue is closely related to defendant's claim on appeal that evidence of his silence while under de facto arrest and pre-*Miranda* violated his right to remain silent under the Fifth Amendment. Additionally, defendant filed a pre-trial motion in limine to exclude all statements elicited post-*Miranda*. In all events, Supreme Court authority allows this court to reach this error, where, as here, defense counsel's failure to make a sufficient objection constitutes ineffective assistance of counsel. (See *People v.*

13

*Centeno* (2014) 60 Cal.4th 659, 675 [court reversed judgment on direct appeal based on finding that defense counsel's failure to object to prosecutor's prejudicial closing remarks constituted ineffective assistance of counsel].) As defendant notes, and the Attorney General does not dispute, there is no possible strategic decision that would support trial counsel's failure to object to the admission of evidence elicited in violation of defendant's constitutional rights.

The fact that there was no evidence before the jury that defendant had invoked his right to remain silent, as the Attorney General notes, is precisely why the proffered evidence, which allowed the jury to consider defendant's silence, is "problematic." (*U.S. v. Waller* (3d Cir. 2011) 654 F.3d 430, 438.) Although the inference of guilt arising from defendant's failure to inquire about the welfare of occupants of the other car may be " 'natural and irresistible' to a jury" (*ibid*), the trial court's overruling of defense counsel's objections gave credence to the testimony and allowed the jury to use defendant's silence as substantive evidence against him in violation of his constitutional right to remain silent. The additional assertion that the prosecutor's questions largely focused on the period before defendant invoked his right to remain silent fares no better. There is no established "threshold quantity of improper questioning to qualify as a constitutional violation." (*U.S. v. Shannon* (3d Cir. 2014) 766 F.3d 346, 359 (*Shannon*).) In *Shannon*, the prosecutor's questioning of Shannon on cross-examination about his "pre-arrest and post-arrest silence received roughly the same degree of inquiry." (*Ibid*.) Nonetheless, the Third Circuit found that "[e]ven if the government had, in fact, asked pages of questions regarding Shannon's pre-arrest silence, the problem remains that it also asked inappropriate questions regarding Shannon's post-arrest silence." (*Ibid*.) The court there found that "the two questions asked by the government regarding Shannon's post-arrest silence violated his Fifth Amendment right to silence, as explained in *Doyle*."[10] (*Shannon, supra,* at p. 359.) So, too, in this case, the prosecutor posed one

---

[10]     In *Doyle, supra,* 426 U.S. 610, the United States Supreme Court held "that 'the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth

question to Officer Price eliciting testimony that while at the collision scene defendant asked if he could go home but did not then inquire about the welfare of the occupants of the other vehicle. Although defense counsel lodged no objection to the testimony of defendant's pre-arrest silence, and even assuming that evidence was properly before the jury, the prosecutor also asked two improper questions, one posed to Sergeant Bailey and one posed to Officer Price, which elicited testimony regarding defendant's silence after he had unambiguously invoked his right to remain silent in violation of his Fifth Amendment right against self-incrimination.

Accordingly, we conclude that on this record the verdict cannot stand as the erroneous admission of the evidence of defendant's silence in violation of his Fifth Amendment right to remain silent was not harmless beyond a reasonable doubt. (Compare *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1487 [erroneous admission of defendant's statements not harmless beyond a reasonable doubt where other evidence of defendant's involvement in killing was mainly circumstantial and prosecutor heavily relied on defendant's statements to undermine the defense case] with *People v. Lewis* (2008) 43 Cal.4th 415, 465-466 [any error in admission of co-defendant's redacted statement at joint trial was harmless beyond a reasonable doubt in light of "powerful evidence supporting the jury's verdicts . . . and the prosecutor's minimal use of [disputed] statement in the relevant portions of his closing argument"].)

## II.  Other Issues

Given our conclusion that the violation of defendant's constitutional due process right to a fair trial requires reversal, we need not resolve the other issues raised on appeal, with one exception. For the guidance of the parties in the event the issue is raised in a retrial (see *People v. Neely* (1993) 6 Cal.4th 877, 896), we shall address defendant's

---

Amendment.' " (*Id.* at p. 619, fn. omitted.)  In *Coffman v. Marlow, supra*, 34 Cal.4th 1, our Supreme Court held that *Doyle* error is committed when silence is used against a defendant " by means of the prosecutor's examination of an interrogating detective even before the defendant has had the opportunity to take the stand." (*Id.* at p. 118.)

15

contention that the jury instructions on gross vehicular manslaughter were legally deficient.

The jury found defendant guilty of gross vehicular manslaughter (GVM)[11] under instructions which identified two predicate offenses—violation of the basic speed law (Veh. Code, § 22350) and reckless driving (Veh. Code, § 23103)[12] — at least one of

_____

[11] The jury was instructed using language in CALCRIM No. 592 in the following manner, in pertinent part: "Gross vehicular manslaughter is a lesser crime than gross vehicular manslaughter while intoxicated. [¶] To prove that the defendant is guilty of gross vehicular manslaughter, the People must prove that: [¶] 1. The defendant drove a vehicle; [¶] 2. While driving that vehicle, the defendant committed a misdemeanor, or infraction; [¶] 3. The defendant committed the misdemeanor, or infraction with gross negligence; [¶] AND [¶] 4. The defendant's grossly negligent conduct caused the death of another person. [¶] The People allege that the defendant committed the following misdemeanor and infraction: [reckless] driving and speeding. [¶] Instructions 2200 and 595 tell you what the People must prove in order to prove that the defendant committed [reckless] driving and speeding. [¶] Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." The jury was further instructed that it could not find defendant guilty unless "all of you agree that the People have proved that the defendant committed at least one of the alleged misdemeanor, or infraction and you all agree on which misdemeanor, or infraction the defendant committed."

[12] The jury was instructed using language in CALCRIM No. 2200 in the following manner, in pertinent part: The People allege that the defendant committed the act of reckless driving in violation of Vehicle Code section 23103. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant drove a vehicle on a highway; [¶] AND [¶] 2. The defendant intentionally drove with wanton disregard for the safety of persons or property. [¶] A person acts with wanton disregard for safety when (1) he [or she] is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he [or she] intentionally ignores that risk. The person does not, however, have to intend to cause damage. [¶] If you conclude that the defendant drove faster than the legal speed limit, that fact by itself does not establish that the defendant drove with wanton disregard for safety. You may consider the defendant's speed, along with all the surrounding circumstances, in deciding whether the defendant drove with wanton disregard for safety."

which the jury had to find beyond a reasonable doubt.  Defendant asserts the standard of gross negligence defined in the GVM instruction is legally indistinguishable from the "wanton disregard for safety" standard defined in the reckless driving instruction. Therefore, according to defendant, the GVM instruction eliminates the requirement that the prosecution prove the predicate offense of reckless driving.[13]  We disagree.

Defendant's contention fails because it assumes that "gross negligence" as defined in the GMV instruction is coextensive with the "wanton disregard for the safety of persons or property" as defined in the reckless driving instruction.  However, as the instructions make clear, "gross negligence" is judged under an objective, reasonable person standard.  (*People v. Watson* (1981) 30 Cal.3d 290 296 ["[a] finding of gross negligence is made by applying an *objective* test:  if a *reasonable person* in defendant's

---

[13]  Defendant relies on *People v. Soledad* (1987) 190 Cal.App.3d 74 (*Soledad*) but the case has no application here.  In *Soledad*, defendant was convicted of gross vehicular manslaughter while intoxicated, pursuant to Penal Code section 192, subdivision (c)(3) (now defined in Penal Code section 191.5).  Penal Code section 192 then defined the offense as driving a vehicle under the influence of alcohol or drugs [in violation of section 23152 or 23153 of the Vehicle Code] and required as elements " '[d]riving a vehicle in violation of [Vehicle Code] section 23152 [influence of alcohol or drugs] or 23153 [influence of alcohol and drugs causing bodily injury to person other than driver] of the Vehicle Code and in the commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in violation of section 23152 or 23153 of the Vehicle Code and in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence.' " (*Soledad, supra*, at p. 80.)  The *Soledad* court noted that to prove the offense the prosecution had to show defendant (1) drove a vehicle in the commission of an "unlawful act" not amounting to a felony with gross negligence *and* (2) drove the vehicle in violation of Vehicle Code section 23152 or 23153. (*Soledad, supra*, at pp. 81-82.)  Reversing defendant's conviction on the ground of instructional error, the *Soledad* court concluded "the jury was neither instructed nor advised at anytime that it must make a finding on the unlawful act element of vehicular manslaughter," in addition to finding defendant drove the vehicle in violation of Vehicle Code section 23152 or 23153. (*Soledad, supra*, at p. 83.)  No such omission occurred here.  The jury was instructed that to prove defendant guilty of gross vehicular manslaughter, the prosecution had to prove defendant drove the vehicle in the commission of a misdemeanor or infraction (i.e., an unlawful act not amounting to a felony) with gross negligence.  Thus, the instruction was free of the defect identified in *Soledad* because the jury was required to make a finding on the unlawful act element of the offense.

position would have been aware of the risk involved, then defendant is presumed to have had such an awareness"].)  On the other hand, to establish the mental state required to prove reckless driving, the evidence must establish that defendant acted with a "wanton disregard for the safety of persons or property" (*People v. Schumacher* (1961) 194 Cal.App.2d 335, 339), where "wantonness" includes the elements of consciousness of one's conduct, intent to do or omit the act in question, realization of the probable injury to another, and reckless disregard of consequences.  (*Id*. at pp. 338-340; see also *People v. Dewey* (1996) 42 Cal.App.4th 216, 221.)  Thus, under the instructions, if the jurors concluded, using the reasonable person standard, that the defendant acted with gross negligence, they were required to make the additional finding that defendant acted with the requisite, subjective mental state required for reckless driving.  Therefore, the GMV instructions did not eliminate the predicate offense element of reckless driving and we reject defendant's assertion of instructional error.

## DISPOSITION

We realize that the conclusion we reach today will not provide certainty of outcome for any of the parties impacted by the tragic vehicular accident which occurred on the evening of February 19, 2007.  However, where, as here, a defendant's right to a fair trial is prejudiced as a result of a violation of his constitutional rights, our duty is clear - we are required to reverse the conviction.  Accordingly, in the appeal in case No. 124765, the judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.  The petition for a writ of habeas corpus in case No. A130151 is dismissed as moot.

_____

Jenkins, J.

We concur:

18

_____
Pollak, Acting P. J.


_____
Siggins, J.