**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 15-4053

————————

UNITED STATES OF AMERICA

v.

BINYAMIN STIMLER,
                    Appellant

————————

No. 15-4094

————————

UNITED STATES OF AMERICA

v.

JAY GOLDSTEIN a/k/a Yaakov

JAY GOLDSTEIN,
                    Appellant

_____

No. 15-4095

_____

UNITED STATES OF AMERICA

v.

MENDEL EPSTEIN,
                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Nos. 3-14-cr-00287-005, 3-14-cr-00287-003 and
3-14-cr-00287-001)
District Judge:  Honorable Freda L. Wolfson

_____

Argued on January 25, 2017

Before: CHAGARES, RESTREPO and ROTH, <u>Circuit
Judges</u>

(Opinion filed: July 7, 2017)

Nathan Lewin                [Argued]
Lewin & Lewin
888 17th Street, N.W.
4th Floor
Washington, DC 20006

Gedalia M. Stern
541 Passaic Avenue
Clifton, NJ 07014
  *Counsel for Appellant Stimler*


Aidan P. O'Connor  [Argued]
Pashman Stein Walder Hayden
21 Main Street
Court Plaza South, Suite 200
Hackensack, NJ 07601
  *Counsel for Appellant Goldstein*


Laura K. Gasiorowski
Robert G. Stahl
Stahl Farella
220 St. Paul Street
Westfield, NJ 07090

Peter Goldberger  [Argued]
50 Rittenhouse Place
Ardmore, PA 19003
  *Counsel for Appellant Epstein*


Mark E. Coyne
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Norman Gross [Argued]
Glenn J. Moramarco [Argued]
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101
*Counsel for Appellee*

---

OPINION

---

ROTH, Circuit Judge

Binyamin Stimler, Jay Goldstein, and Mendel Epstein are Orthodox Jewish rabbis who were charged with various kidnapping-related offenses, stemming from their involvement in a scheme through which they, along with others,[1] sought to assist Orthodox Jewish women to obtain divorces from recalcitrant husbands. After a jury trial, all three defendants were convicted of conspiracy to commit kidnapping. The defendants now appeal various rulings made by the District Court before, during, and after trial. Because we find no merit in any of the defendants' arguments, we will affirm all three convictions.

---

[1] The other rabbis associated with the ring were variously 1) charged but pled guilty, 2) went to trial and were acquitted, or 3) had their charges dismissed by the government. Stimler, Goldstein, and Epstein were the only three to be convicted after trial.

4

# I[2]

In the Orthodox Jewish tradition, a married woman cannot obtain a religious divorce until her husband provides her with a contract called a "*get*" (pluralized as "*gittin*"), which must, in turn, be signed by an "*eid*," or witness. A woman who attempts to leave her husband without obtaining a *get* becomes an "*agunah*" (pluralized as "*agunot*"), which subjects her to severe social ostracism within the Orthodox Jewish community. *Agunot* may seek relief in a "*beth din*," a rabbinical court presided over by a panel of three rabbis. The *beth din* may then issue "*psak kefiah*," or contempt orders authorizing sanctions, which include, but are not limited to, the use of force against a husband to secure a *get*. To assist an *agunah* to obtain a *get* is a "*mitzvah*," or religious commandment of the Orthodox Jewish faith. Starting in at least 2009, Stimler, Epstein, and Goldstein participated in the *beth din* process to help *agunot* obtain *gittin*. They worked with "tough guys" or "muscle men" in exchange for money to kidnap and torture husbands in order to coerce them to sign the *gittin*.

In 2013, the FBI learned of the kidnapping ring and began investigating the rabbis. As part of this investigation, an FBI agent posed as an *agunah* and approached Epstein. The agent met with Epstein at his home in New Jersey. Epstein suggested that kidnapping would be appropriate in the agent's "situation," promising that "what we're doing is

---

[2] As all three defendants were convicted, the facts and evidence are taken in the light most favorable to the government. *United States v. Ozcelik*, 527 F.3d 88, 93 (3d Cir. 2008).

basically gonna be kidnapping a guy for a couple of hours and beatin' him up and torturing him . . .."[3]  One month after this meeting, Epstein and Goldstein found a potential location for the kidnapping.  Epstein then convened a *beth din* at which he, Goldstein, and a third rabbi presided.  Together, the rabbis issued a *psak kefiah* authorizing the use of force against the agent's "husband."  Epstein and the agent subsequently planned the details, including the date, location, and manner of the kidnapping of the "husband."  On the day of the kidnapping, a team of rabbis and "tough guys" assembled at the agreed-upon location.  Goldstein and Stimler arrived in disguise and Stimler conducted counter-surveillance of the area.

Once the kidnapping team had assembled, the FBI arrested them.  Epstein and Stimler were each charged with one substantive kidnapping count, one count of attempted kidnapping, and one count of conspiracy to commit kidnapping.  Goldstein was charged with two substantive kidnapping counts, one count of attempted kidnapping, and one count of conspiracy.

During its preparation for trial, the government applied for a court order, pursuant to Section 2703(d) of the Stored Communications Act (SCA), compelling AT&T to turn over historic cell site location information (CSLI) generated by Goldstein's phone.  CSLI is generated every time a cell phone user sends or receives a call or text message; when the call or message is routed through the nearest cell tower, the user's service provider generates and retains a record identifying the particular tower through which the communication was

---

[3] JA 4654.

6

routed.[4] In more densely populated areas, cell towers are able to triangulate an individual's approximate location based on the individual's distance from the three nearest towers. Thus, while less precise than traditional GPS systems, historic CSLI records can nonetheless generate a rough profile of an individual's approximate movements based on the phone calls that individual makes over a period of time. The order for such records, covering a total of 57 days of Goldstein's location history, was issued by a magistrate judge on October 30, 2014.

## II

The defendants filed numerous pretrial motions before the District Court; we consider only the three which are relevant to this appeal. First, Goldstein moved to suppress the CSLI obtained pursuant to the SCA, arguing that cell phone users have a reasonable expectation of privacy in such metadata, implicating the Fourth Amendment's warrant requirement. The District Court denied Goldstein's motion, reasoning that collection of CSLI "does not involve physical intrusion upon [Goldstein's] property or any real time tracking information" and did not "concern the search or seizure of a cell phone, or the content of any communication."[5]

Second, all three defendants sought dismissal of the indictment pursuant to the Religious Freedom Restoration Act (RFRA), arguing that the government's decision to prosecute

---

[4] *United States v. Epstein* (*Epstein II*), No. 14 CR 287, 2015 WL 1646838, at *1 (D.N.J. Apr. 14, 2015).
[5] *Epstein II*, 2015 WL 1646838, at *3.

7

them substantially burdened their sincerely held religious beliefs and was not the least restrictive means of furthering any compelling government interest. Stimler raised the additional argument that RFRA required him to be severed from the trial of Epstein and Goldstein. The District Court rejected these arguments, finding that the government's decision to prosecute the defendants did not substantially burden their religious exercise.[6] In the alternative, the District Court found that the government had a compelling interest in the uniform prosecution of kidnapping laws and that the prosecution of the defendants was the least restrictive way of achieving that interest.[7] The District Court summarily rejected Stimler's request for severance, reasoning that the joint prosecution was not a substantial burden and that "[t]here is nothing in [RFRA] which suggests that it can be used to argue for severance."[8]

Third, the defendants sought to introduce evidence of their religious beliefs and, more broadly, of Orthodox Jewish law in order to negate the motive element of the kidnapping statute, or, in the alternative, to demonstrate consent on the part of the husbands. The District Court refused to admit such evidence, finding that it was irrelevant both to motive and to the affirmative defense of consent. In the alternative, the District Court held that the evidence would be unduly prejudicial under Rule 403 of the Federal Rules of Evidence,

---

[6] *United States v. Epstein* (*Epstein I*), 91 F. Supp. 3d 573, 582-83 (D.N.J. 2015).
[7] *Id.* at 584-85.
[8] *Id.* at 588.

8

as it "would carry a significant potential for jury nullification."[9]

At trial, the government introduced a variety of evidence against the defendants. As relevant here, the government introduced testimony from FBI agents placing Stimler and Goldstein at the site of the proposed kidnapping in a disguise. The agents stated that Stimler performed counter-surveillance at the site. The government also introduced the statements made about Goldstein by another rabbi at a *beth din* convened to determine the validity of a *get* obtained from one of the prior kidnappings. After both the government and the defense rested, the judge instructed the jury as to the elements of each charged offense and sequestered the jury for deliberations. On the fourth day of deliberations, the jury sent a question to the judge, inquiring whether failure to intervene could make an individual liable for kidnapping. The judge wrote back that, having interpreted the question to refer only to the substantive kidnapping counts, the answer was no. The defendants objected to this response, arguing that it implied that failure to intervene could support a conviction for the attempt and conspiracy charges.

All three defendants were convicted. Stimler was sentenced to 39 months incarceration, Goldstein to 96 months, and Epstein to 120 months. They appealed. We consolidated the appeals for disposition.

---

[9] *Id.* at 597.

9

## III[10]

This appeal presents eight issues, not all of which apply to every defendant. As such, we treat each issue in turn, and note which defendants have raised which claims.

## A.

We first address whether the District Court erred in denying Goldstein's[11] motion to suppress the CSLI evidence. Because the parties agree as to all the relevant facts and dispute only the legal implications thereof, our review is plenary.[12] Section 2703 of the SCA authorizes the government to "require a provider of electronic communication service . . . to disclose a record or other

---

[10] The District Court had jurisdiction over the criminal prosecutions of the three defendants pursuant to 18 U.S.C. § 3231. We have jurisdiction over the defendants' appeal pursuant to 28 U.S.C. § 1291.

[11] To the extent Epstein also seeks to challenge the District Court's denial of the motion to suppress, he lacks standing to do so because it does not appear that the government obtained any CSLI about his whereabouts. *See United States v. Nagle*, 803 F.3d 167, 178 (3d Cir. 2015) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)).

[12] *United States v. Lafferty*, 503 F.3d 293, 298 (3d Cir. 2007) ("We . . . exercise plenary review as to [a suppression motion's] legality in light of the [district] court's properly found facts." (internal quotation marks and citation omitted)).

10

information pertaining to a subscriber to or customer of such service . . . when the governmental entity . . . obtains a court order for such disclosure . . ."[13]  Such a court order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe" that the records "are relevant and material to an ongoing criminal investigation."[14]  Notably, this "reasonable grounds" requirement is a lesser burden than the "probable cause" requirement of the Fourth Amendment.[15]

Recognizing that the SCA permits precisely what the government here did, Goldstein argues that the SCA violates the Fourth Amendment insofar as it authorizes the government to require disclosure of historic CSLI without obtaining a warrant.  To the extent that historic CSLI records allow the government to aggregate an individual's movement history over an indefinite period of time, Goldstein argues that the Supreme Court has suggested that individuals have a reasonable expectation of privacy in such information.  In the alternative, Goldstein asserts that the government failed to meet even the relaxed "reasonable grounds" requirement of the SCA.  In response to Goldstein's constitutional argument,

---

[13] 18 U.S.C. § 2703(c)(B).  The parties do not dispute that cell site location information is a record "pertaining to" the user of a cell phone.

[14] 18 U.S.C. § 2703(d).

[15] *In re Application of the United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government* (*In re Application*), 620 F.3d 304, 315 (3d Cir. 2010) ("[T]he standard [of reasonable grounds] is an intermediate one that is less stringent than probable cause.").

the government rests primarily on the third-party doctrine,[16] arguing that cell phone users voluntarily turn over CSLI to their service providers. With respect to Goldstein's statutory arguments, the government maintains that the detailed descriptions of prior kidnappings allegedly committed and the identification of specific periods of interest provided "reasonable grounds" for disclosure.

We do not decide these questions on a blank slate. Both parties agree that our decision in *In re Application of the United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government* (*In re Application*) addresses the same issues presented in this appeal. In *In re Application*, we rejected the applicability of the third-party doctrine to CSLI, holding that the transmission of CSLI was not truly voluntary.[17] We went on to conclude, however, that the SCA's disclosure regime did not violate the Fourth Amendment because individuals lack a reasonable expectation of privacy in CSLI.[18]

Pursuant to our Internal Operating Procedures, "the holding of a panel in a precedential opinion is binding on

---

[16] The third-party doctrine precludes defendants from asserting any privacy interests in information which they voluntarily disclose to third parties. *United States v. Christie*, 624 F.3d 558, 573-74 (3d Cir. 2010).

[17] *In re Application*, 620 F.3d at 317.

[18] *Id.* at 312-13 (explaining that CSLI does not implicate an individual's privacy interests because such interests "are confined to the interior of the home" and holding that "CSLI from cell phone calls is obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination").

subsequent panels."[19]  Thus, as a general matter, we remain obliged to follow our precedent absent en banc reconsideration.  A narrow exception to this rule exists, however, where intervening legal developments have undercut the decisional rationale of our precedent.[20]  We have described this as an exacting standard; we generally will not decline to follow our precedent unless it "no longer has *any* vitality"[21] or is "patently inconsistent"[22] with subsequent legal developments.  Because *In re Application* has not been overturned by this Court sitting en banc, we will continue to follow it in its entirety unless the government demonstrates that intervening legal developments have undermined *In re Application*'s rejection of the third-party doctrine or Goldstein can demonstrate that intervening changes in the law have created a reasonable expectation of privacy in CSLI.  We conclude that neither the government nor Goldstein have met their respective burdens.

**1.**

We begin with the government's contention that individuals voluntarily convey CSLI to their cell service

---

[19] 3d Cir. I.O.P. 9.1.

[20] *See, e.g.*, *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008) ("A panel of this Court may reevaluate the holding of a prior panel which conflicts with intervening Supreme Court precedent." (citations omitted)).

[21] *West v. Keve*, 721 F.2d 91, 93 (3d Cir. 1983) (emphasis added).

[22] *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009) (quoting *Cox v. Dravo Corp.*, 517 F.2d 620, 627 (3d Cir. 1975)).

providers. The government attempts to sidestep *In re Application* by characterizing its rejection of the third-party doctrine as *dictum*. However, the government placed the issue of the third-party doctrine squarely before us in *In re Application* by arguing that the doctrine prevented CSLI from ever implicating Fourth Amendment concerns. We explicitly considered and rejected this argument, reasoning that "[a] cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way."[23] We noted, however, that § 2703(c) offers the judge the option of requiring probable cause before CSLI is released.[24] By holding that magistrate judges presented with requests for § 2703(d) orders retain discretion under § 2703(c) to "mak[e] a judgment about the possibility that such disclosure would implicate the Fourth Amendment,"[25] we necessarily rejected the third-party doctrine. Had the government been correct that CSLI records were records voluntarily disclosed to third parties, CSLI could never implicate an individual's reasonable expectation of privacy and thus would never be protected by the Fourth Amendment's warrant requirement. Thus, the rejection of the third-party doctrine was necessary to the holding of *In re Application*.

The government suggests, nevertheless, that this Court "should join all of its sister circuits" in applying the third-party doctrine to CSLI,[26] apparently arguing that the

---

[23] *In re Application*, 620 F.3d at 317.

[24] *Id.* at 319.

[25] *Id.* at 317.

[26] *See, e.g.*, *United States v. Graham*, 824 F.3d 421, 425 (4th Cir. 2016) (*en banc*).

14

subsequent decisions of other circuits may constitute intervening legal authority allowing departure from our precedent. We have never so held, and we decline to do so now. To the contrary, in declining to follow our decisions, we have recognized intervening authority only from the Supreme Court of the United States, Congress, or administrative agencies.[27] Accordingly, we continue to adhere to our view, espoused in *In re Application*, that the third-party doctrine does not apply because cell phone users do not voluntarily disclose CSLI to their service providers simply by signing a service contract.[28]

**2.**

We next address whether intervening changes in law undermine *In re Application*'s holding that CSLI does not implicate an individual's reasonable expectation of privacy. Goldstein argues that the Supreme Court's subsequent decisions in *Riley v. California*[29] and *United States v. Jones*[30]

---

[27] *See, e.g.*, *Baptiste v. Attorney Gen.*, 841 F.3d 601, 609 n.8 (3d Cir. 2016) (noting that "an intervening Supreme Court decision . . . is also a 'sufficient basis' for us to reevaluate our precedent" even without *en banc* review); *United States v. Adams*, 252 F.3d 276, 286 (3d Cir. 2001) (noting that "a panel may reevaluate a precedent in light of intervening authority and amendments to statutes and regulations").

[28] For these reasons, to the extent that sections of the District Court opinion may be read to suggest that the third-party doctrine applies here, those sections are reversed. *See, e.g.*, *Epstein II*, 2015 WL 1646838, at *3.

[29] 134 S. Ct. 2473 (2014).

[30] 565 U.S. 400 (2012).

15

render the underpinnings of *In re Application* untenable, and warrant a departure from our precedent. In Goldstein's view, *Riley* and *Jones*, taken together, strongly imply that an individual has a reasonable expectation of privacy in his or her aggregated movements over a period of time, particularly where cell phones are involved.

We are not persuaded by Goldstein's readings of *Riley* and *Jones*. In *Riley,* the Supreme Court held that officers' warrantless search of data stored on an individual's cell phone ran afoul of the Fourth Amendment, noting that the diversity and quantity of data stored on mobile phones today created a reasonable expectation of privacy therein.[31] However, *Riley* focused primarily on protecting the *contents* of cell phones, not metadata generated from cell phone usage.[32] This distinction is far from trivial; Fourth Amendment jurisprudence has consistently protected only the contents of an individual's communications.[33] We recently emphasized this point in *United States v. Stanley*,[34] rejecting the argument

---

[31] *Riley*, 134 S. Ct. at 2494-95.

[32] *Id.* at 2489 (discussing the amount and variety of data stored on cell phones).

[33] *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 353 (1967) ("The Government's activities in electronically *listening to and recording the petitioner's words* . . . constituted a 'search and seizure' within the meaning of the Fourth Amendment.") (emphasis added); *Smith v. Maryland*, 442 U.S. 735, 741 (1979) (finding no Fourth Amendment violation in warrantless application of a pen register because "pen registers do not acquire the *contents* of communications") (emphasis in original).

[34] 753 F.3d 114 (3d Cir. 2014).

that an individual had a reasonable expectation of privacy in his or her IP address routed through a third party's wireless router. Even though we acknowledged that obtaining an individual's IP address could roughly track his or her location, we reasoned that such records "revealed only the path of the signal establishing this connection [and] revealed nothing about the *content* of the data carried by that signal."[35] *Riley*'s holding is thus an application of the Fourth Amendment's protection of content. Goldstein does not argue that the CSLI at issue here is content, nor would we find any such argument persuasive.[36] Accordingly, *Riley* provides little support for extending Fourth Amendment protections to historic CSLI.

Goldstein's argument finds better support in the statements of the concurring opinions of *Jones*, in which the Supreme Court held that warrantless placement of a GPS tracker on an individual's car for 28 days, and the resulting aggregated movement history, violated the Fourth Amendment.[37] Although the majority rested on a trespass theory to reach this conclusion, five justices—in two separate concurrences—suggested that location tracking also

---

[35] *Id.* at 122.

[36] In the wake of *Riley*, we have adopted a flexible test for determining whether data is content or ancillary by analyzing whether the data is "part of the substantive information conveyed to the recipient," noting that "location identifiers have classically been associated with non-content means of establishing communication." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 136 (3d Cir. 2015) (internal quotation marks and citation omitted).

[37] *Jones*, 565 U.S. at 412-13.

17

implicated an individual's reasonable expectation of privacy. Justice Sotomayor, writing separately, expressed her view that the Fourth Amendment inquiry turns on "whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on."[38]   Justice Alito's concurrence, which was joined by three other justices, echoed this idea, focusing on "whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove."[39]

We do not believe that either concurrence in *Jones* has undercut *In re Application* in any meaningful way because of the different technologies at issue.  *Jones* dealt with GPS tracking, not historic CSLI.  *In re Application* expressly considered the differential accuracy of CSLI and GPS, holding that CSLI is less intrusive on individuals' privacy rights than GPS tracking.  *Jones* made no suggestion that this holding was erroneous.

Goldstein admits the inexact nature of CSLI.  He concedes that the tower which transmits the signal is generally, but not always, the tower closest to the cell phone. He further concedes that a phone may change from one tower to another nearby tower during a call without the phone having moved.  Because of the less precise nature of CSLI

---

[38] *Id.* at 416 (Sotomayor, J., concurring).
[39] *Id.* at 419 (Alito, J., concurring in the judgment).

data, we are not persuaded that CSLI is sufficiently similar to GPS to warrant departure from *In re Application*.[40]

Goldstein's reading of *Jones* suffers from another flaw; four of the five justices, who engaged in an analysis of whether individuals have a reasonable expectation of privacy in their movements, expressly limited their consideration to areas in which Congress has not provided statutory protection. Justice Alito's concurrence noted that "[i]n circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative."[41] This, he explained, is because "[a] legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive

---

[40] We do note some aspects of the testimony adduced at trial that suggest that the line between GPS tracking and CSLI records is blurring. It appears that the government used CSLI to track Goldstein's movement down various interstate highways between New York and New Jersey. R. 3497a-3502a. The government's expert explained that CSLI is no longer only generated at the beginning and end of each call, but at every point at which an individual moves closer to a different cell tower. R. 3497a. The government expert further stated that, given the density of cell towers in New York and New Jersey, CSLI generated there is relatively precise. R. 3492a-94a. Finally, the expert noted that CSLI records are generated far more frequently than they used to be, including when an individual sends text messages or uses certain applications. R. 3531a-32a.

[41] *Jones*, 565 U.S. at 429 (Alito, J., concurring in the judgment).

19

way."[42]   Citing to the wiretapping statute as an example, Justice Alito stated that, where Congress strikes a particular balance between digital age privacy rights and government investigative interests, "regulation . . . has been governed primarily by statute and not by case law."[43]   Justice Alito expressly warned against judicial creation of new privacy interests, cautioning that "judges are apt to confuse their own expectations of privacy with those of the hypothetical reasonable person . . .."[44]

Here, Congress has expressly weighed the privacy rights in digital information against government interest in passing the SCA.[45]   Justice Alito's concurrence suggests that we should be wary of revisiting this balance that Congress has struck.[46]

Accordingly, Goldstein's readings of *Jones* and *Riley* do not persuade us to reconsider our own precedent, nor do

---

[42] *Id.*

[43] *Id.* at 428.

[44] *Id.* at 427.

[45] *In re Application*, 620 F.3d at 313-15 (discussing the legislative history of the SCA).  Other circuits agree with this determination as well.  *See, e.g.*, *United States v. Carpenter*, 819 F.3d 880, 889 (6th Cir. 2016) ("Congress has specifically legislated on the question . . . and in doing so has struck the balance reflected in the [SCA].").

[46] Moreover, in view of the balance reflected by the statutory provisions for obtaining a court order under § 2703(d), we are particularly loathe to disregard the holding in *In re Application* based not on a direct holding of the Supreme Court, but on two cobbled together concurrences in *Jones*.

we see any independent reason to do so. While the rapidly evolving nature of CSLI may one day give us a reason to reconsider the distinction between GPS and CSLI, we decline to do so today. We continue to adhere to our view of *In re Application*: the Fourth Amendment is not violated when the government has shown "reasonable grounds to believe that the . . . records . . . are relevant and material to an ongoing criminal investigation."[47]

**3.**

Goldstein argues, in the alternative, that the government failed to meet the "reasonable grounds" standard of the SCA. As noted above, the "reasonable grounds" standard is a lesser burden than that of probable cause, and "in essence is a reasonable suspicion standard."[48] We thus look to the totality of the circumstances to determine whether the government had a "particularized and objective basis" for believing that the CSLI would assist its investigation, mindful of the fact that agents are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . .."[49]

---

[47] 18 U.S.C. § 2703(d).

[48] *United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015); *accord In re Application of the United States of America for an Order Pursuant to 18 U.S.C. Section 2703(d)*, 707 F.3d 283, 287 (4th Cir. 2013).

[49] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted).

In light of this threshold, we find that the government's application was more than satisfactory. The government presented information about the kidnapping ring, the charged kidnappings, and the alleged involvement of each defendant. In addition,, the government stated that another coconspirator had implicated the defendants in his statements to agents.[50] The government then explained that its request was limited to CSLI records "during the time periods when the alleged kidnappings and attempted kidnappings occurred" in order to "identify the location of the alleged participants . . .."[51] Collectively, this information provided the government with reasonable grounds to believe that the records would be relevant to their investigation.[52]

Accordingly, we will affirm the District Court's order denying suppression of the CSLI records obtained pursuant to the SCA.

## B.

We next turn to the arguments raised by all three defendants that various aspects of the prosecution violated RFRA. Because the motion implicates the proper scope of

---

[50] SA 9.

[51] *Id.*

[52] The government urges us to adopt a strict rule that suppression of evidence is not among the remedies available under the SCA. Two of our sister circuits have so held. *See Carpenter*, 819 F.3d at 890; *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014). In light, however, of our holding that the government's application satisfied the SCA, we need not and do not reach this question.

RFRA, we exercise plenary review.[53] RFRA proscribes government conduct which "substantially burden[s] a person's exercise of religion" unless the government can demonstrate, *inter alia,* that the burden is the "least restrictive means of furthering [a] compelling government interest."[54] This proscription extends to the government's criminal prosecutions under laws of general applicability; a defendant "may raise RFRA as a shield in the hopes of beating back the government's charge."[55] The party invoking RFRA bears the initial burden of making out a prima facie case by showing that (1) it possesses a sincerely held religious belief, and (2) the government's conduct substantially burdened that belief.[56] The burden then switches to the government to demonstrate that its conduct is the least restrictive means of furthering a compelling interest.[57]

**1.**

We agree with the District Court's holding that the defendants failed to satisfy their burden of establishing that the government substantially burdened their religious beliefs by prosecuting them for kidnapping. While the government's decision to prosecute the defendants undoubtedly constituted a burden on their sincerely held religious beliefs, the District

---

[53] *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).

[54] 42 U.S.C. § 2000bb-1.

[55] *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016).

[56] *Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013); *see also Adams v. Comm'r of Internal Revenue*, 170 F.3d 173, 176 (3d Cir. 1999).

[57] *Tagore*, 735 F.3d at 330; *Adams*, 170 F.3d at 176.

23

Court properly analyzed whether the burden was "substantial" by looking to acceptable alternative means of religious practice that remained available to the defendants.[58] Here, none of the defendants argue that they are unable to participate in the *mitzvah* of liberating *agunot* without engaging in kidnapping; as the District Court noted, "it is unclear whether all non-violent methods were exhausted before the alleged kidnappings took place here."[59] The defendants do not challenge this determination on appeal. As the defendants have failed to demonstrate that the prosecution was a "substantial" burden, we will affirm the District Court's holding that prosecution under the federal kidnapping statute did not violate RFRA.

Moreover, even if the defendants had demonstrated that the government's actions constituted a substantial burden on their religious exercise, we would nonetheless affirm the District Court's determination that the government has a compelling interest in uniform application of laws about violent crimes and that no other effective means of such uniformity existed. The Supreme Court has advised that the government's interest in preventing serious crimes "is both legitimate and compelling."[60] The defendants fail to cite, nor can we identify, any cases in which any court has allowed RFRA to shield individuals in the commission of violent crimes.

---

[58] We have previously examined the adequacy of alternative means of practice in determining whether a religious burden is "substantial." *See, e.g.*, *Washington v. Klem*, 497 F.3d 272, 282-83 (3d Cir. 2007).

[59] *Epstein I*, 91 F. Supp. 3d at 582.

[60] *United States v. Salerno*, 481 U.S. 739, 749 (1987).

24

Accordingly, we will affirm the District Court's denial of the motion to dismiss the indictment.

**2.**

We turn next to the argument raised only by Stimler that his joinder with Epstein and Goldstein constituted an independent RFRA violation. No court appears to have answered the question of whether RFRA imposes further limits on the government's ability to structure a prosecution. The Supreme Court has noted that RFRA requires only that an individual face "serious disciplinary action"[61] for acting on their religious beliefs. This phrase encompasses sanctions short of prosecution. However, Stimler's briefing fails to suggest that the joinder itself was any kind of sanction, nor does it suggest that the joinder caused any burden on his religious exercise; instead, it focuses entirely on whether the prosecution itself worked a unique burden on Stimler's religious practice. Thus, we need not determine the exact boundaries of RFRA here, as Stimler has not adequately alleged that joinder violated his rights under RFRA.

**C.**

All three defendants challenge the District Court's decision under Rules 402 and 403 of the Federal Rules of

---

[61] *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (second alteration in original). Although *Holt* dealt with a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Supreme Court has stated that RLUIPA "imposes the same general test as RFRA . . .." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014).

Evidence to bar admission of evidence about Orthodox Jewish marital law and the religious motivations for the kidnappings, arguing that such evidence was relevant to negating the specific intent required for conviction. Alternatively, the defendants argue that evidence of Orthodox Jewish laws about marital duties would be relevant to showing that the husbands consented to the kidnappings. We review a district court's exclusion of evidence for an abuse of discretion, but review de novo its interpretation of the Federal Rules of Evidence.[62]

In relevant part, the federal kidnapping statute requires that the kidnapping be committed "for ransom or reward or otherwise . . .."[63] The District Court properly read this language as encompassing a broad set of potential motives, including the religious benefit of performing a *mitzvah*, while reasoning, however, "that religious motivation simply cannot negate the intent to commit a crime."[64] We agree that a religious benefit can constitute a "benefit" under the statute.

We will also affirm the District Court's determination that the evidence of religious practices was not relevant to the affirmative defense of consent. The defendants argue that, by practicing Orthodox Judaism and signing a marriage contract, the husbands consented to any use of force authorized by any *beth din*. The District Court properly rejected this argument, reasoning that "[w]hile consent can be a defense to kidnapping, it has to be specific and cannot be prospective in

---

[62] *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008).

[63] 18 U.S.C. § 1201(a).

[64] *Epstein I*, 91 F. Supp. 3d at 595.

nature."[65]  The defendants do not argue that the religious evidence would demonstrate that the husbands gave specific consent to their particular kidnappings; accordingly, we agree that the religious evidence was not relevant to the affirmative defense.

We further agree with the District Court that any marginal relevance that the religious evidence may have had was substantially outweighed by the prejudicial impact it would have had on the trial.  Suggesting that the defendants acted for a religious purpose might have given rise to the potential for jury nullification, which we have held is substantially prejudicial.[66]

Accordingly, we find no abuse of discretion in the District Court's decision under Rules 402 and 403 to exclude evidence about Orthodox Jewish marital law.

## D.

We next turn to the argument, raised by Epstein and Goldstein, that the District Court erred in three respects in charging the jury.  First, they argue that the District Court failed to include the jurisdictional element of the kidnapping offense in the conspiracy instruction.  Second, they contend that the District Court erred in refusing to charge the jury that kidnapping requires the victim to be held for an appreciable

---

[65] *Id.*

[66] *See United States v. DeMuro*, 677 F.3d 550, 566 (3d Cir. 2012) (finding that it was not abuse of discretion to exclude evidence that "had the potential for confusion and opened the door to jury nullification.").

27

period of time.  Finally, the defendants claim that the District Court's instruction as to motive constituted a constructive amendment of the indictment inasmuch as it did not include the specific religious motives charged in the indictment. Because the defendants did not object in the District Court, our review is for plain error.

A district judge's failure to instruct the jury as to a necessary element of the offense "*ordinarily* constitutes plain error"[67] unless the instructions as a whole make clear to the jury all necessary elements of the offense.[68]  In determining whether there has been a plain error in jury instructions, we "consider the totality of the instructions . . ., not focusing on a particular paragraph in isolation."[69]  Finally, even if the instructions omitted a necessary element in a way that would confuse the jury, we may nonetheless affirm if "no reasonable jury could find that the element was not present."[70]

We see no merit in the claim that the District Court failed to make clear the interstate commerce element in instructing the jury on the conspiracy charge.  While the conspiracy charge included no explicit jurisdictional

---

[67] *United States v. Haywood*, 363 F.3d 200, 207 (3d Cir. 2004) (quoting *United States v. Xavier*, 2 F.3d 1281, 1287 (3d Cir. 1993)) (emphasis in original).

[68] *See, e.g.*, *United States v. De Lazo*, 497 F.2d 1168, 1171 n.6 (3d Cir. 1974).

[69] *United States v. Kukafka*, 478 F.3d 531, 539 (3d Cir. 2007) (citing *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995)).

[70] *United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012) (citation omitted).

requirement, it did state that the jury would have to find that the defendants conspired to engage in "kidnapping, *as alleged in the indictment*."[71] The parties agree that the District Court included this element in the instructions as to the substantive kidnapping counts and in the indictment. We therefore conclude that the instructions as a whole made clear that the conspiracy charge required the jury to find a conspiracy to commit a kidnapping that would cross state lines.

We similarly decline to find error in the District Court's decision to not include a temporal element in the kidnapping instruction. Seizing on just one line in *Chatwin v. United States*, the defendants argue that federal kidnapping requires holding the victim "for an appreciable period."[72] We do not believe that the Supreme Court intended to create a new limit on kidnapping liability—one not found anywhere in the statutory text—in one line of *dictum*. Further, as the government properly notes, we have upheld jury instructions that do not refer to any temporal limit on kidnapping liability even after *Chatwin*.[73] Indeed, we have upheld convictions when an individual was held for mere minutes.[74] Moreover, even if we were to see merit in the defendants' assertions on this point, we would nonetheless affirm. No reasonable juror

---

[71] R. 4123a.

[72] 326 U.S. 455, 460 (1946).

[73] *See, e.g.*, *United States v. Sriyuth*, 98 F.3d 739, 750 (3d Cir. 1996).

[74] *Cf. Government of Virgin Islands v. Ventura*, 775 F.2d 92, 96 (3d Cir. 1985). In fact, *Ventura* dealt with the Virgin Islands aggravated kidnapping statute, under which we have expressly held that we must consider "the duration of the detention." *Id.* at 95 (citation omitted).

would have failed to find that the seizure, blindfolding and coercion by the defendants did not involve holding for "an appreciable period."

Finally, the District Court did not constructively amend the indictment because, in instructing the jury, it actually did include the specific motive charged in the indictment. The defendants assert that the indictment alleged that the defendants' motive was "to threaten and coerce Jewish husbands to give *gets* to their wives."[75] The District Court expressly stated in its instructions that "[t]he indictment alleges the defendants had a purpose of holding the individual victims to coerce them into giving a *get* to the victim's wife."[76] In light of this instruction, and the entirety of the evidence produced at trial, we cannot say that there is any "*substantial* likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment . . . actually charged." [77]

Accordingly, we reject the defendants' challenges to the District Court's jury instructions.

### E.

Stimler and Goldstein next argue that the District Court improperly responded to a question from the jury on the third day of deliberations. The jury asked the District Court whether "element #1 of kidnapping"—the "seizes,

---

[75] R. 174a.

[76] R. 4128a.

[77] *United States v. Daraio*, 445 F.3d 253, 260 (3d Cir. 2006) (emphasis added).

30

confines, inveigles, decoys, kidnaps, abducts, or carries away and holds" requirement—could be satisfied "[i]f you know that someone is being confined against their will and . . . do not intervene . . .."[78] The District Court responded that it "interpreted [the] question as referring to the kidnapping counts, counts 2 and 3. If that is accurate, then the answer to [the] question is no."[79] The court further told the jury that if they were "inquiring about any other count, please so indicate, so that I may more fully consider [the] question and answer appropriately."[80] Stimler objected to this response, asserting that it suggested that the conspiracy count could be satisfied by failure to intervene. Because Stimler properly objected to the response, we conduct plenary review.[81] If we determine that the response was improper, we nonetheless may affirm if the error was harmless.[82]

We do not agree that the District Court's response improperly suggested that liability could be found upon a failure to intervene. The District Court expressly stated that it was speaking only to the substantive kidnapping counts, and suggested nothing about the other counts, noting that it would need to "more fully consider [the] question" to "answer appropriately" if the jurors had questions about the other counts. Accordingly, we find no error in the District Court's response to the jury's question.

---

[78] R. 4853a.

[79] R. 4854a.

[80] *Id.*

[81] *United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011) (citation omitted).

[82] *Id.*

31

**F.**

Goldstein and Epstein next challenge the admission of certain statements made by alleged co-conspirators, arguing that the statements were inadmissible hearsay under the Federal Rules of Evidence and violated the Confrontation Clause. While we "review a nonconstitutional challenge to the admission of hearsay for abuse of discretion," we "exercise plenary review over Confrontation Clause challenges."[83] In distinguishing when to review admission of evidence under the Confrontation Clause from when to review under the Federal Rules of Evidence, the touchstone of our inquiry is "whether the contested statement by an out-of-court declarant qualifies as testimonial . . .."[84] "[W]here nontestimonial hearsay is concerned, the Confrontation Clause has no role to play in determining the admissibility of a declarant's statement."[85] A statement is testimonial only if it meets two requirements: (1) it is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact;"[86] and (2) it was made primarily for the purpose of "prov[ing] past events potentially relevant to later criminal prosecution."[87] If the contested statement is testimonial, we

---

[83] *United States v. Berrios*, 676 F.3d 118, 125 (3d Cir. 2012) (internal quotation marks and citations omitted).

[84] *Id.* at 127.

[85] *Id.* at 126.

[86] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)).

[87] *Michigan v. Bryant*, 562 U.S. 344, 361 (2011) (internal quotation marks and citation omitted); *see also Ohio v. Clark*, 135 S. Ct. 2173, 2184 (2015) (Scalia, J., concurring in the judgment) (formalizing two-part inquiry).

next must determine "if the defendant had a prior opportunity to cross-examine [the declarant]."[88]

The statements at issue were testified to by Aryeh Ralbag, another rabbi involved in the kidnapping ring. At trial, Ralbag described the statements made before a *beth din* which was convened when the alleged victim of one of the charged kidnappings had challenged the validity of the *get* he signed. Ralbag and two other rabbis presided at the *beth din*, and four witnesses—including Goldstein and Stimler—testified that Goldstein and Stimler had served as *eid* in procuring the contested *get*.[89]

We have no trouble concluding that these statements were not testimonial within the meaning of the Sixth Amendment. It is clear that none of the individuals at the *beth din*—all of whom were charged as part of the conspiracy—would have reasonably believed that they were making statements for the purpose of assisting a criminal prosecution. Accordingly, the Confrontation Clause is inapplicable to defendants' challenge, and we only analyze whether the statements were inadmissible hearsay under the Federal Rules of Evidence.[90]

---

[88] *Giles v. California*, 554 U.S. 353, 358 (2008).

[89] The other two witnesses, and Ralbag himself, were arrested and charged as part of the kidnapping ring. Ralbag was granted immunity in exchange for his testimony, and the other two witnesses pled guilty to lesser offenses.

[90] We therefore decline to consider whether the defendants had an adequate opportunity to cross-examine the two other witnesses at the *beth din*, an issue which neither the defendants nor the government has briefed.

Rule 801 of the Federal Rules of Evidence explains that a statement is not hearsay if "the statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."[91] The Rule thus imposes two predicate inquiries before a statement will be admitted: (1) the statement must be made by a coconspirator,[92] and (2) the statement must be made during the course of and in furtherance of the conspiracy. Both requirements must be satisfied by a preponderance of the evidence.[93] Goldstein and Epstein assert that neither requirement was met here. We disagree. The fact that the two other individuals were present at the warehouse as part of the kidnapping team, coupled with their knowledge of the other kidnappings, was sufficient to demonstrate that they were indeed coconspirators.[94] Similarly, because the purpose of the conspiracy was broadly to secure valid *gittin* from husbands, statements by coconspirators to prove the validity of the *gittin* were clearly made during the course and in furtherance of the conspiracy, regardless of when they were

---

[91] Fed. R. Evid. 801(d)(2)(E).

[92] A declarant will be considered a "coconspirator" whenever a conspiracy existed between the declarant and the party against whom the statement is offered. *See United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

[93] *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

[94] The mere fact that the two other individuals were allowed to plead to violations of other statutes does not persuade us otherwise; prosecutors have broad discretion in deciding what to charge and what pleas to accept. *See Bordenkircher v. Hayes*, 434 U.S. 357, 368 n.2 (1978) (Blackman, J., dissenting).

occurred.[95]   We thus find no error, constitutional or otherwise, in the District Court's decision to admit the statements made at the *beth din*.

Even if we were to assume that the statements were improperly admitted, however, we would nonetheless affirm because any error was harmless. [96]  As noted, Ralbag testified as to statements made by four witnesses, including Goldstein and Stimler.  The defendants do not challenge the admission of the statements they themselves made, which largely paralleled those of the other two witnesses; the statements of the other two witnesses, therefore, were largely duplicative, and any error in their admission was harmless.[97]

Accordingly, we conclude that the District Court properly admitted the evidence.

---

[95] *See, e.g.*, *United States v. Weaver*, 507 F.3d 178, 185-87 (3d Cir. 2007) (holding that statements made after the core acts of the conspiracy were committed were in furtherance of the conspiracy insofar as they were made to conceal the unlawful acts).

[96] *See United States v. Moreno*, 809 F.3d 766, 774, 776 (3d Cir. 2016) (citations omitted) (noting that harmless error review applies to both admission of hearsay evidence and violations of Confrontation Clause, although the harmless error inquiry under the Federal Rules of Evidence is a "slightly less onerous standard").

[97] *Cf. DeMuro*, 677 F.3d at 564-65 (noting that exclusion of duplicative evidence is well within the discretion of a trial judge).

## G.

Stimler next challenges the sufficiency of the evidence against him. We employ a "particularly deferential standard of review" to appeals challenging the sufficiency of evidence presented to the jury.[98] In examining the sufficiency of the evidence, we should not "weigh the evidence or . . . determine the credibility of witnesses."[99] Rather, the defendant bears the "very heavy burden" of showing that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[100]

Stimler has failed to meet this burden. The government presented uncontested evidence that Stimler was present at the site of the proposed kidnapping, and wore a disguise. The government next introduced evidence that Stimler performed countersurveillance by walking around the warehouse with a flashlight. On appeal, Stimler presents an alternative explanation of these facts. Simply disagreeing with the jury's interpretation of the facts, however, is insufficient. We believe that the jury made a reasonable inference in finding that Stimler knew of the conspiracy and took affirmative steps to help carry it out. We therefore affirm his conviction.

---

[98] *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).

[99] *Id.* (internal quotation marks and citation omitted).

[100] *Id.* (citation omitted).

**H.**

Finally, all three defendants challenge the FBI's sting operation as conduct so outrageous that it violated due process. This claim is procedurally barred, as the defendants failed to make the argument in the District Court, despite full knowledge of the scope of the government's investigation. Nor do the defendants identify any new information that supports their claim of outrageous government conduct. We have made clear that such failure waives challenges to allegedly outrageous government conduct.[101]

Moreover, even if this argument had been preserved, we would see no merit to it. In reviewing claims of outrageous government conduct, we "repeatedly have noted that we are 'extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.'"[102] We have rejected the argument that the government's invitation to engage in criminal activity rises to this level where, as here, the defendants used their own knowledge and connections to set up and carry out the unlawful conduct.[103] We have suggested that "the supply of ingredients" to commit a crime would be insufficient to meet

---

[101] *United States v. Salahuddin*, 765 F.3d 329, 350 (3d Cir. 2014).

[102] *United States v. Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008) (quoting *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996)).

[103] *United States v. Lakhani*, 480 F.3d 171, 182 (3d Cir. 2007).

37

this standard.[104]  Given that Epstein first suggested the use of violence, and that the defendants assembled the kidnapping team, chose a location, and acquired their own tools, we see no due process violation here.

## IV.

In our legal system, "liberty and social stability demand a religious tolerance that respects the religious views of all citizens . . .."[105]  Respect for religious beliefs cannot, however, trump all other legitimate, and sometimes competing, government objectives.  This appeal asks us to clarify the balance between religious freedom and public safety.  The balance here clearly lies on the side of public safety.  For the reasons stated above, we will affirm the District Court's convictions of Mendel Epstein, Jay Goldstein, and Binyamin Stimler.

---

[104] *See United States v. Twigg*, 588 F.2d 373, 378 (3d Cir. 1978).

[105] *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 860 (2005) (internal quotation marks and citation omitted).

RESTREPO, *Circuit Judge*, concurring in part and concurring in the judgment.

I join parts I, II, III(A)(1), and III(B)-(H) of the Opinion of the Court, which address the parties' arguments concerning the application of the third party doctrine to historical cell site location information ("CSLI"); applications of the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, to discretionary trial procedure decisions of the District Court; introduction of evidence about Orthodox Jewish law; propriety of jury instructions and the District Court's response to jury questions; admission of co-conspirator statements; sufficiency of evidence; and outrageous government conduct. However, I concur only in the judgment with respect to parts III(A)(2)-(3), because I believe that the Government obtaining 57 days of aggregated CSLI with only a § 2703(d) order supported by reasonable suspicion is, in this case, a warrantless search that violates the Fourth Amendment. I depart from the Majority because of two Supreme Court opinions that have issued since our own Court last considered this issue.

## I

"[T]he holding of a panel in a precedential opinion"—such as that in our Court's most recent opinion on law enforcement requests for CSLI, *In the Matter of the Application of the United States for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government*, 620 F.3d 304 (3d Cir. 2010) ("*In re Application*")—"is binding on subsequent panels." Third Circuit I.O.P. 9.1. This rule exists for good reason: it maintains uniformity of law within the Circuit, and promotes

1

predictability for litigants. However, if Supreme Court authority abrogates or calls existing Circuit precedent into question, our Court has recognized that subsequent panels may decline to follow the prior holding without reconsidering the issue *en banc*. *George Harms Constr. Co., Inc. v. Chao*, 371 F.3d 156, 161 (3d Cir. 2004); *see also Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996).

This exception to our Internal Operating Procedures is narrow. When our Court has declined to follow past precedent on the basis of intervening Supreme Court authority, we typically have declined to follow only the specific portions of the prior precedent that the intervening authority has called into question or abrogated. *United States v. Johnson*, 587 F.3d 203, 207 n.4 (3d Cir. 2009); *see also Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011). I agree with the Majority that the third party doctrine holding of *In re Application* has not been called into question by subsequent authority. However, I take a different view on the ongoing vitality of the reasonable expectation of privacy analysis in *In re Application*, in light of Supreme Court opinions in *United States v. Jones*, 565 U.S. 400 (2012), and *Riley v. California*, 134 S.Ct. 2473 (2014).

*Jones* and *Riley* have "sufficiently undercut the decisional basis" of *In re Application*'s holding that magistrate judges can issue a § 2703(d) order for aggregated location information, rather than requiring a warrant, in many instances. *West v. Keve*, 721 F.2d 91, 93 (3d Cir. 1983). *In re Application* held that magistrate judges *could* require a warrant for CSLI upon considering the individual surveillance target's reasonable expectation of privacy under the Fourth

Amendment. With the more recent guidance of *Jones* and *Riley*, I would conclude that in at least most factual circumstances—including those before us—magistrate judges *must* require a warrant for the aggregated collection of historical CSLI to comply with the Fourth Amendment.

In *Jones*, law enforcement officers surreptitiously placed a tracking device on the bumper of a surveillance target's car without a valid warrant, and collected 28 days' worth of global positioning system ("GPS") location data. *Jones*, 565 U.S. at 403. The lead opinion in *Jones* held that this conduct violated the Fourth Amendment because of the physical trespass committed. *Id.* at 404-05. In what has come to be regarded as the "shadow majority" of *Jones*,[1] however, five Justices in two concurrences disagreed with the reasoning of the lead opinion, which "disregards what is really important (the *use* of a GPS for the purpose of long-term tracking)." *Jones*, 565 U.S. at 424 (Alito, J., concurring) (emphasis in original). Those Justices found a constitutional privacy interest implicated by aggregated tracking of an individual's location over time. *Id*. at 430 (Alito, J.,

---

[1] *See, e.g.*, *In the Matter of the Application of the United States of America for an Order Authorizing Disclosure of Historical Cell Site Information for Telephone Number [Redacted]*, 40 F. Supp. 3d 89, 92 (D.D.C. 2014) (rejecting a § 2703(d) application absent a showing of probable cause or more evidence about CSLI, because of "serious questions about whether the Fourth Amendment requires a warrant to obtain CSLI" in light of *Jones*).

concurring); *id.* at 413-14 (Sotomayor, J., concurring).[2]  That reasonable expectation of privacy reflects the intrusion that occurs when the Government can aggregate enough location data on individuals to draw inferences about their private lives and constitutionally protected activities.  *Id.* at 416 (Sotomayor, J., concurring).  The concurrences place more weight on protecting the privacy interest itself, and, in particular, considering the aggregation of information obtained by the Government.  *Id.* at 426 (Alito, J., concurring); *id.* at 414 (Sotomayor, J., concurring).

Historically, this interest has been protected in part by resource constraints facing law enforcement agencies—but those resource constraints no longer present an obstacle to this type of aggregation.  In the past, obtaining aggregated location information on any individual by tracking him or her "for any extended period of time was difficult and costly and therefore rarely undertaken."  *Id.* at 429 (Alito, J., concurring).  Constant monitoring of an individual's location is possible now, however, because of new technology "available at a relatively low cost."  *Id.* at 416 (Sotomayor, J., concurring); *id.* at 429 (Alito, J., concurring).  Those former resource constraints, however, have shaped what the *Jones*

---

[2] Although the lead opinion in *Jones* resolved the case on the basis of physical trespass, it addressed the concurrences' position that the trespass theory provided insufficient protection of an individual's reasonable expectation of privacy by acknowledging that "[i]t may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy."  *Jones*, 565 U.S. at 412.

shadow majority recognized as a reasonable expectation of privacy. Historically, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 430 (Alito, J., concurring).

Here, in its § 2703(d) application to the Magistrate Judge, the Government requested location information for 57 total days. Such a quantity of location information prompts exactly the question Justice Sotomayor posed in *Jones*: "whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring); *see also id.* at 419 (Alito, J., concurring). Five Justices in *Jones* would answer that question in the negative—at least as to aggregation exceeding "the 4-week mark." *Id.* at 430 (Alito, J., concurring); *see also id* at 415 (Sotomayor, J., concurring).

The Majority declines to read the *Jones* concurrences as undercutting "*In re Application* in any meaningful way" in part "because of the different technologies at issue." Maj. Op. 15. To the extent that tracking an individual's cell phone by CSLI and tracking an individual's car by GPS differ, the privacy interest that protects an individual from the Government aggregating that location information (without a warrant) remains the same. If anything, the reasonable expectation of privacy in aggregated location derived from an individual's use of a cell phone is stronger than the reasonable expectation of privacy in aggregated location derived from that same individual's use of a car. Aggregating

5

data points from cell phone location into a comprehensive record offers the Government more opportunity to infer things about an individual, because cell phones accompany individuals many places that cars do not. "Historic location information . . . can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Riley*, 134 S.Ct. at 2490. Moreover, cell phones accompany individuals who travel by public transit or otherwise not by car, regular drivers who temporarily rent a different car, and those who ride in the cars of others. And regardless of how an individual moves through the world, "nearly three-quarters of smartphone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." *Id*.

The Majority also reads the *Jones* shadow majority as not undercutting *In re Application* in part because of the distinction in precision between GPS data—at issue in *Jones*—and the CSLI at issue here. This distinction has nearly disappeared since we decided *In re Application*. By the time of the events at issue in this case, CSLI had grown quite precise, particularly in more densely-populated jurisdictions.[3] In cities where wireless providers have more towers to provide service for more people packed into a given area, the identifiable radius in which a subscriber would

---

[3] Because we consider the case on the facts before us, we consider CSLI as precise as it is in urban areas. It may be that the less precise CSLI in rural areas is so dissimilar from GPS location data as to make *Jones* inapplicable, but we need not consider that question.

6

connect to one tower rather than another is substantially smaller. In explaining this concept to the jury, the Government's expert at trial noted that the layout of "tightly compacted towers in Brooklyn" "will reduce the coverage area of" any one tower. App. 3494a. The number of towers and antennas in Brooklyn, for instance, allowed the expert to note proximity to an antenna on "the side of a building near the intersection of Webster Avenue and . . . Coney Island Avenue." *Id.* The expert also used CSLI to describe an individual's "southbound movement on I-278." App. 3499a-500a.

By contrast, when the *In re Application* court considered this issue, CSLI did "not provide information about the location of the caller closer than several hundred feet." *In re Application*, 620 F.3d at 311. Since then, wireless network improvements have included the distribution of "hundreds of thousands of 'microcells,' 'picocells,' and 'femtocells,'" which function similarly to hotspots and create CSLI that "can in some cases be more accurate than GPS." Stephanie K. Pell & Christopher Soghoian, Can You See Me Now?: Toward Reasonable Standards For Law Enforcement Access To Location Data That Congress Could Enact, 27 Berkeley Tech. L.J. 117, 132 (2012). Even the proliferation of traditional cell towers has resulted in smaller coverage areas and CSLI that is "far more accurate—in some cases as good as GPS." *Id*. at 133.

The reasonable expectation of privacy of an individual in an urban area in the aggregated location information of his or her CSLI is functionally indistinguishable from the reasonable expectation of privacy of that same individual in the aggregated location information of his or her GPS data.

7

Distinguishing *Jones* on the basis of the greater precision of GPS ignores the current capabilities of CSLI, and indeed, the use the Government made of it in this case.

Although the Majority distinguishes *Riley* from the facts here by separating contents and metadata, *Riley* should inform our analysis of the reasonable expectation of privacy in CSLI, as well. The animating principle behind *Riley* is the same as the principle behind *Jones*: the Government may violate an individual's reasonable expectation of privacy when it obtains too much aggregated information without a warrant. In *Riley*, decided two years after *Jones*, the aggregation at issue merely took a different form. There, the Supreme Court recognized that the aggregation of data allowed by the increased capacity of digital storage helps law enforcement agents make inferences that intrude on an individual's reasonable expectation of privacy. The Court held unconstitutional a warrantless search of a cell phone, in part because the types of information stored on the cell phone in question "reveal[ed] much more in combination than any isolated record." *Riley*, 134 S.Ct. at 2489.

The *Riley* Court rejected applications of doctrine created for older technologies that allowed for less aggregation of historically protected information. The Court distinguished call logs on modern cell phones from pen registers in part on the basis that "call logs typically contain more than just phone numbers; they include any identifying information that an individual might add." *Id.* at 2493. While cataloguing the different types of data stored on cell phones that had not historically been stored on landline telephones, the Court explained that doctrines governing "qualitatively different" pre-digital counterparts do not

8

compare well to modern technology in considering questions of criminal procedure. *Id*. at 2490, 2493. Allowing warrantless collection by analogy to older technologies would instead cause "a significant diminution of privacy." *Id.* at 2493.

Here, technological changes since *In re Application* in the provision of wireless service mean that CSLI—like the phone itself, in *Riley*—conveys a greater quantity of information for the Government to aggregate than it did previously. The Government's application for CSLI encompassed more data points than merely the location at the time of incoming or outgoing telephone calls. In requesting "[a]ll data about which 'cell towers' and 'sectors' *received a radio signal from each cellular telephone or device assigned to the Account, including, but not limited to, per call management data or return Time from Tower data*," App. 459 (emphasis added), the Government sought information that would allow for essentially continuous location tracking, rather than rare location snapshots. AT&T, from which the government sought and obtained the information, collects CSLI data upon call "hand-offs," which occur when a person moves while on a call, and the call switches to routing through the next tower (or a different face of the same tower) as the individual gets closer to it. App. 3497a. At trial, the Government's expert was able to use hand-offs during a defendant's 52-second call to describe the CSLI as "consistent with southbound movement on I-278" from New York to northern New Jersey. App. 3499a-3500a. Tracking an individual through space during the course of a call represents more data to aggregate—and a correspondingly greater privacy intrusion—than simply collecting his or her location only at the origination and termination of a call.

9

The application also reflects the Government's capability to obtain data from use of a cell phone that it could not typically have obtained from an individual's use of a telephone, which the *Riley* Court regarded as a reason to require warrants for cell phone searches. *Riley*, 134 S.Ct. at 2489. Here, the Government requested location information for text messages, as well. Indeed, the Government's request to AT&T may stretch even more broadly than calls and texts—asking for data about each time a tower "received a radio signal," App. 459, from a phone could conceivably encompass any time any application on a phone, even one running passively in the background, connects to the network. *In re Application for Telephone Information Needed for a Criminal Investigation*, 119 F. Supp. 3d 1011, 1024 (N.D. Cal. 2015) (affirming a magistrate judge's denial of an application for CSLI under § 2703(d)). CSLI may be generated by an action as innocuous as a user's email application passively checking for mail in the background without an active request that it do so by the user. *Id.* Collecting data at every radio signal—whether the origin or termination of a call, a call hand-off, a text message, or a data connection by an application—threatens an individual's reasonable expectation of privacy more than collecting data at the origination and termination of calls only.

For all of the foregoing reasons, I believe that the Government obtaining the quantity of historical CSLI it did in this case amounts to a search that, without a warrant, infringes on an individual's reasonable expectation of privacy and violates the Fourth Amendment.

## II

All of this said, I would not suppress the CSLI evidence in this case because of the good faith exception to the warrant requirement. "Searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *United States v. Katzin*, 769 F.3d 163, 172-73 (3d Cir. 2014) (en banc) (quoting *Davis v. United States*, 564 U.S. 229, 231 (2011)).[4] *In re Application* amounted to binding Circuit precedent that "specifically authorize[d the] particular police practice" at issue here. *Davis*, 564 U.S. at 241. As such, the CSLI in this case need not have been excluded, and I concur with the Opinion of the Court as to the judgment on this issue.

---

[4] The Opinion of the Court and the dissents in *Katzin* disagree as to how directly a prior case must authorize particular law enforcement conduct to amount to "binding appellate precedent" on which law enforcement officers could rely. *Compare Katzin*, 769 F.3d at 174, *with id*. at 192-93 (Greenaway, Jr., J., dissenting). This case presents no such question of directness. The *Katzin* dissents also pointed out that limiting the application of the exclusionary rule might lead to more occasions of law enforcement officers conducting searches not sanctioned by judges. *See id.* at 189-90 (Greenaway, Jr., J., dissenting). Here, agents still sought out the imprimatur of a neutral magistrate judge for the search (albeit under a lesser standard than probable cause).

# III

Despite applying the good faith exception to the warrant requirement in this instance, I believe that obtaining historical CSLI that approaches GPS-level precision, aggregated over at least the four week period the *Jones* shadow majority rejected—as in this case—should require a warrant supported by probable cause rather than a § 2703(d) order supported by reasonable suspicion. "Our cases have historically recognized that the warrant requirement is an important working part of our machinery of government, not merely an inconvenience to be somehow weighed against the claims of police efficiency." *Riley*, 134 S.Ct. at 2493 (internal quotation marks omitted). Especially where "[r]ecent technological advances . . . have . . . made the process of obtaining a warrant itself more efficient," we need not sanction the rapid pace and expansive scope of technological change eroding important constitutional protections that we have enjoyed for centuries. *Id.* "The [Fourth] Amendment and the common law from which it was constructed leave ample room for law enforcement to do its job. A warrant will always do." *U.S. v. Carloss*, 818 F.3d 988, 1015 (10th Cir. 2016) (Gorsuch, J., dissenting).

For all of the foregoing reasons, I concur only as to the judgment in parts III(A)(2)-(3) of the Opinion of the Court.